## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NAVAJO HEALTH FOUNDATION<br>d/b/a SAGE MEMORIAL HOSPITAL, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| MICHAEL O. LEAVITT,<br>Secretary, United States Department of<br>Health and Human Services, and<br>THE UNITED STATES OF AMERICA, | )  Civ. Action No. 1:07-00151 (RWR)<br>)  ECF<br>)<br>)<br>) |
| Defendants. | )<br>) |

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION TO PERMIT DISCOVERY

### INTRODUCTION

This case challenges a contract declination decision of the Indian Health Service ("IHS" or the "Agency"), an agency of defendant United States Department of Health and Human Services ("HHS"). IHS provides health care services, either directly or through various types of contracts, for over 1.6 million American Indians and Alaska natives, belonging to more than 500 Indian Tribes. Plaintiff seeks to obtain discovery of information which is not part of the administrative record and which was not before the agency when the IHS area office issued the declination decision.

Plaintiff, Navajo Health Foundation/Sage Memorial Hospital ("Sage" or "NHF"), is an American Indian "tribal organization" that has contracted with IHS for many years to provide health care services to eligible IHS beneficiaries residing in the area of Ganado, Arizona. At the time that this lawsuit was filed, Sage was providing these health care services pursuant to two separate contracts: a) a procurement contract in the amount of approximately $6.3 million for the

provision of patient care services at Sage Memorial Hospital located in Ganado, Arizona, and b) an Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450, et seq. ("ISDA") contract in the amount of approximately $2.6 million to purchase certain health care services from third-party providers other than Sage, along with certain pharmacy services.

On August 29, 2006, NHF submitted an ISDA proposal to the Navajo Area Office of the IHS ("NAIHS") seeking to expand the scope of its existing ISDA contract to include all of the services Sage was providing under its procurement contract, along with the associated funding of approximately $6.3 million. Finding that Sage's proposal, if fully approved, would violate federal law, the NAIHS issued a "declination" letter partially declining plaintiff's proposal on December 5, 2006. Plaintiff filed its Complaint on January 22, 2007, challenging the declination decision. In that Complaint, plaintiff alleges that the declination grounds provided by defendant were improper and that plaintiff should be awarded the full ISDA contract it sought in its proposal. Defendants filed their Answer on April 30, 2007. Defendants filed the Administrative Record with the Court on September 11, 2007. On January 22, 2008, plaintiff filed its motion for permission to conduct discovery ("Discovery Motion").

Plaintiff now seeks discovery of information that is not part of the administrative record and which was not before the agency when the IHS area office issued the declination. Plaintiff makes two arguments in support of its motion: a) it should be given wide-ranging discovery beyond what is appropriate in a district court review of an agency administrative determination that is governed by the APA, and b) the administrative record in this action is incomplete in that it should include the contract provisions provided to another Navajo Area ISDA contractor, Utah Navajo Health Services, Inc. ("UNHS"), even though this information was not relevant to the

Agency's declination decision and was not before the IHS area office at the time it made its

declination decision.  Both arguments are without merit.

As a general matter judicial review of agency action, such as that requested here, is not *de
novo,* but is limited to the administrative record before the agency.  *De novo* review is the

exception.  "The applicability of *de novo* review to administrative actions is limited and is

generally not presumed in the absence of statutory language or legislative intent to the contrary.

Judicial review is governed by the Administrative Procedure Act ("APA") in this action

because the ISDA does not provide the standard of review.  Section 450m-1(a) of the ISDA

authorizes judicial review by providing jurisdiction in the United States district courts over "any

civil action or claim against the appropriate Secretary arising under" the ISDA.  25 U.S.C. §

450m-1(a).  The ISDA does not, however, provide a standard of review to be applied in civil

actions arising under the Act.   It is well settled that, when a statute authorizes judicial review of

agency action without providing standards for that review, courts look to the APA for guidance.

In turn, except in the rare case, review of agency action must be based on the record

before the agency and, hence, a reviewing court may not consider matters outside the

administrative record. The narrow, specifically limited, circumstances required to permit

discovery in a record review case are not present here.  Hence review should be limited to the

administrative record and plaintiff's motion for discovery should be denied.

Turning to plaintiff's request to supplement the record, plaintiff has asserted that the

ISDA contract awarded to UNHS should be included in the administrative record in this action.

However, this information is not relevant to the declination decision at issue because UNHS is a

different tribal organization located in a different IHS service area *which is served by a different*

3

*IHS area office.* Moreover, this information was not considered by the agency at the time of the declination decision. Hence, plaintiff's motion to supplement the record should be denied.

## STATUTORY FRAMEWORK

Congress enacted the ISDA in 1975 to promote "effective and meaningful participation by the Indian people in the planning, conduct, and administration" of federal programs and services for Indians. 25 U.S.C. § 450a(b). Under the ISDA, Indian Tribes or tribally designated organizations ("tribes" or "tribal organizations") may elect to enter into "self-determination contracts" with the Secretary of the Interior and the Secretary of Health and Human Services ("Secretary") to assume operation of services for Indians otherwise administered directly by those departments. 25 U.S.C. § 450f.

### A. General Provisions of ISDA

The ISDA directs the Secretary "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract" to "plan, conduct, and administer programs or portions thereof." 25 U.S.C. § 450f(a)(1). The Secretary is required to approve a tribe's proposed self-determination contract within 90 days unless the Secretary issues a written finding clearly demonstrating that the proposal is deficient according to certain specified declination criteria. 25 U.S.C. § 450f(a)(2).

The ISDA thus effectively entitles a tribe to step in to the shoes of a federal agency in receiving federal funds and administering government services. The statute recognizes that the unique, government-to-government nature of self-determination contracts differs from standard government procurement contracts. See 25 U.S.C. § 450b(j) ("no [self-determination] contract ... shall be construed to be a procurement contract"); S. Rep. No. 274, *supra*, at 18 ("The term 'self-

4

determination contract' means an intergovernmental contract that is not a procurement contract. This definition recognizes the unique nature of self-determination contracts between the Federal government and Indian tribal governments.")

Within 90 days of receipt of a self-determination contract proposal, the Secretary must award the contract unless he makes a declination finding that one or more of the following declination criteria apply to the proposal:

(A)    the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

(B)    adequate protection of trust resources is not assured;

(C)    the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

(D)    the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 106(a); or

(E)    the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of the programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f, section 102(a)(2)(A-E).

In addition, the Secretary may award a contract based upon only a portion of an ISDA proposal.  ISDA states that the Secretary shall approve any severable portion of a contract proposal that does not support a declination finding.  If the Secretary determines that a contract proposal (a) proposes in part to plan, conduct, or administer a program, function, service or activity ("PFSA") that is beyond the scope of programs covered by 106(a)(1), or (b) proposes a level of funding in excess of the applicable level determined by 106(a)(1), subject to any alteration in the scope of the proposal that the Secretary and the tribal organization agree to, the Secretary shall, as appropriate, approve such portion of the PFSA or approve an appropriate level of funding. 25 U.S.C. § 450f.

5

B.    **Funding Of Self-Determination Contracts Under ISDA**

1.  **The "Secretarial Amount"**

With respect to the amount of funds provided to a tribe that elects to assume operation of a federal program, the ISDA, as originally enacted, provided for transferring the amount that the Secretary would have allocated to the program if he were still administering it directly. 25 U.S.C. § 450j-1(a)(1) ("amount of funds provided ... shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs"). That amount of funding is sometimes referred to as the "Secretarial amount."

2. **Contract Support Costs**

Congress amended the ISDA and directed the Secretary to add to the Secretarial amount an amount for "contract support costs" ("CSC"). 25 U.S.C. § 450j-1(a)(2). CSC are costs that a tribe incurs in operating a program but that the Secretary would not incur if he were directly administering the program. 25 U.S.C. § 450j-1(a)(2). By definition, therefore, funding for CSC is over and above what the Secretary would require to operate the same program directly. Such costs would include certain employment taxes and expenses to which the federal government is not subject, and costs that non-federal entities must incur when contracting with the federal government to ensure compliance and accountability.

At the same time that it provided for funding of CSC in the 1988 amendments, Congress also prescribed an overarching limitation on the Secretary's obligation to provided funds to a tribe under a self-determination contract. Pub. L. No. 100-472, § 205, 101 Stat. 2293 (codified as amended at 25 U.S.C. § 450j-1(b)). That provision states:

6

> Notwithstanding any other provision in this subchapter, the provision of funds
> under this subchapter is subject to the availability of appropriations and the
> Secretary is not required to reduce funding for programs, projects, or activities
> serving a tribe to make funds available to another tribe or tribal organization
> under this subchapter.

25 U.S.C. § 450j-1(b); 25 U.S.C. § 458aaa-18(b) (same) (enacted as part of IHS Self-Governance

provisions in 2000). In addition, Congress, anticipating that appropriations may be insufficient

for full funding of CSC for all Tribes, directed the Secretary to submit an annual report setting

out, *inter alia*, "an accounting of any deficiency in funds needed to provide required contract

support costs to all contractors for the fiscal year." 25 U.S.C. § 450j-1( c)(2).

Beginning in fiscal year 1998, Congress imposed an explicit, "not to exceed" cap on

funding by IHS for CSC. *See*, *e.g.*, FY 2006 Department of the Interior and Related Agencies

Appropriations Act, Pub. L. No. 109-54, 119 Stat. 499, 540 ("not to exceed $268,683,000 shall

be for payments to tribes and tribal organizations for contract or grant support costs").

### C.    Contract Health Services

For programs operated by the IHS, the Agency provides health care services to its Indian

beneficiaries either directly at its own facilities, or, in the event that IHS does not have the

staffing or expertise to provide the services itself, by purchasing necessary services from third-

party providers. These third party services are commonly referred to as "contract health services,"

or "CHS." Recognizing the Agency's growing need to purchase specialty and other health care

services from third parties, Congress has historically provided specific funding in the Agency's

annual appropriations for such CHS care. In FY 2006, for example, Congress provided that

"$507,021,000 for contract medical care shall remain available for obligation . . ." *Id*. Because

CHS funds are "earmarked" by Congress in the annual appropriations, these funds *must* be used

to purchase services from third party providers, and may not be used by IHS to fund the cost of

services the Agency provides at its own facilities with Agency staff and resources.

## **FACTUAL BACKGROUND**

The background pertinent to this motion is brief.  Plaintiff,  Sage Memorial Hospital,

located in Ganado, Arizona, opened in 1901.  In the late 1960's or early 1970's, the ownership of

the hospital was turned over to a non-profit tribal organization, the Navajo Health Foundation to

provide medical care on the Navajo reservation.  Complaint ¶ 2.

While IHS had been purchasing health care services from Sage on a case-by-case basis

for many years using CHS funds, it did not enter into a single contract for a bundled set of

services until the late 1990's. Recognizing the benefits of a single, all-inclusive contract for

patient care services with Sage rather than obtaining those same services through individual

purchase orders, the Agency entered into a  procurement contract with Sage on May 29, 1997,

Contract No. 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, with the Agency providing Sage with approximately $8 million in

CHS funding to be used to provide a broad range of inpatient and outpatient health care to IHS

beneficiaries, as well as emergency services, public health nursing, behavioral health services,

dental services, and other health care services, including health care services that Sage would

purchase from other third party providers. (Administrative Record  ("AR") at 8). This contract,

was in effect at the time Sage submitted its ISDA proposal in September 2006.

Given certain financial benefits that would accrue to Sage if it were able to provide these

same health care services pursuant to an ISDA contract rather than a procurement contract,

including the right to receive CSC funding, Sage began the process of seeking designation from

the Navajo Nation as an Indian "tribal organization" eligible to contract with IHS under the

authority of the ISDA.[1] After it was sanctioned by the Navajo Nation to serve as a "tribal organization" for PL 93-638 contracting purposes, Sage submitted its first PL 93-638 proposal for FY 2000. This proposal, however, was declined by NAIHS and  Sage chose not to appeal the Agency's declination decision.

Subsequently, in October, 2003, NAIHS received an ISDA contract proposal from Sage ("2003 Proposal").  The 2003 Proposal requested that all of the funds that Sage was then receiving pursuant to its procurement contract (approximately $8.4 million) be transferred into an ISDA contract with NAIHS. Although the funds to be transferred were CHS funds, Sage proposed operating an ISDA contract providing a broad range of services, including direct care, public health nursing, environmental health services, mental health, dental services, etc. Sage also requested approximately $7.8 million in CSC funding in support of its program.

Following several rounds of negotiations and several extensions of the statutory 90-day declination review period, on September 30, 2004, the NAIHS awarded a PL 93-638 contract to Sage, effective October 1, 2004, for approximately $2.6 million in CHS funds that would be used by Sage to purchase services from other third party providers. (AR 579). The remaining funds, approximately $6.3 million, continued to be provided to Sage via its procurement contract, enabling Sage to provide direct care services to IHS beneficiaries at its hospital with these CHS

---

[1] The ISDA only authorizes "Indian tribes" and "tribal organizations" to contract with IHS to provide health care services that IHS would otherwise provide to its Indian beneficiaries. See 25 U.S.C. § 450f(a)(1) and (2). A "tribal organization" is defined in the Act as "the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities." 25 U.S.C. § 450b(l).

funds.

Simultaneously with the award of the ISDA contract, NAIHS issued a declination letter partially declining Sage's proposal. Specifically, NAIHS declined to award the full level of funding requested by Sage on the basis that all of that funding was CHS earmarked funds, and so only a portion of those funds could be transferred to Sage under an ISDA contract to perform CHS services. The declination letter also declined Sage's proposal for CSC and for certain Area office and IHS HQ tribal shares. Sage chose not to file an appeal from this declination decision. (AR 581).

Following the declination of the 2004 Proposal, both Sage and IHS staff continued to explore the possibility of a "reprogramming" of the CHS funds that were being used to fund the procurement contract into non-earmarked funds that could be used to provide direct patient care services. Such a reprogramming would enable NAIHS to contract with Sage under the ISDA for the full $8.9 million that Sage sought. Following a face-to-face meeting between Sage and IHS management officials on May 2, 2006, IHS and Sage entered into a Memorandum of Understanding ("MOU"), dated May 23, 2006, whereby the parties agreed that the IHS would seek reprogramming of the CHS funds in the IHS appropriation for FY 2007. In the MOU, Sage expressly acknowledged its understanding that IHS could not make any commitment to reprogram the funding, and that, without express legislative authorization, any such reprogramming would be in violation of federal appropriations law. Sage also expressly acknowledged that no funds would be reprogrammed into the CSC line item and that there would not be any additional CSC funding available for Sage's ISDA contract in FY 2007. (AR 997-98).

The "reprogramming" request was never approved by Congress. Despite the fact that

Sage knew of the failure to obtain a reprogramming of the CHS funds, it once again submitted an ISDA proposal, dated August 29, 2006 ("2007 proposal"), that requested funding of its ISDA contract to include all of the approximately $6.3 million it was then receiving in its procurement contract  in addition to the approximately $2.6 million it was currently receiving under its existing ISDA contract. (AR 605).

NAIHS issued a declination letter on December 5, 2006, partially declining Sage's ISDA proposal. (AR 983).  The primary rationale for the declination was that the additional ISDA contract funding Sage was seeking would require CHS "earmarked " funds, and those funds could not be transferred to Sage to provide the proposed additional services, which were direct care services rather than contract health services. The declination letter also declined Sage's proposal for contract support costs and for certain Area office and IHS HQ tribal shares.

With regard to Sage's proposal to provide direct care services with CHS funds, the Agency provided the following rationale in its 2006 declination letter. As so long as NAIHS contracts with Sage and transfers funding to Sage under a procurement contract, it is using CHS dollars as required by Congress: NAIHS is purchasing health care services for eligible beneficiaries through a third-party contract.  Sage is then authorized under the procurement contract to provide direct health care services to the eligible Indians to be served under the scope of the procurement contract.  However, if NAIHS were to transfer the CHS funds to Sage under an ISDA contract, rather than through the mechanism of a procurement contract, then, under the ISDA, Sage would be"stepping into the shoes" of IHS and be required to use the CHS dollars for the same purposes as IHS was obligated by Congress to use those same CHS funds. In other words, Sage would be required to purchase health care services from a third party provider rather

11

than provide direct care services itself.  While this would not create an appropriations problem, it

would result in an unsatisfactory level of health care services because the patients being served

under Sage's procurement contract would not be funded for an adequate level of direct care

services, and would have to be referred to a variety of outside providers, as required by CHS

regulations.  Therefore, Sage's FY 2007 Proposal was declined on the basis that the services to

be rendered to the Indian beneficiaries of this particular program would not be satisfactory. *See*

25 USC § 450f(a)(2)(A) (AR 985-986).

**<u>Procedural History of this Action</u>**

Plaintiff filed its Complaint on January 22, 2007, challenging the declination. Plaintiff

alleges that the declination ground provided by defendant was improper and that plaintiff should

be awarded the full ISDA contract it sought. *See*  Complaint ¶¶ 37-45. Defendants filed their

Answer on April 30, 2007 (Dkt. # 5).  Defendants provided a courtesy copy of the Administrative

Record to plaintiff on August 7, 2007.   Defendants filed the Administrative Record with the

Court on September 11, 2007 (Dkt. ## 10-12).

The Administrative Record that has been filed with the Court contains a true and

complete copy of all documents considered by NAIHS in determining whether or not to award an

ISDA contract to plaintiff for the 2007 fiscal year at issue in this action, and if so, for how much.

The documents comprising the Administrative Record are: plaintiff's ongoing procurement

contract, its ongoing partial ISDA contract, the fiscal year 2004 ISDA proposal, the fiscal year

2004 declination, and all related correspondence, the fiscal year 2007 ISDA proposal, the fiscal

year 2007 declination, and all related correspondence, all documents concerning plaintiff's

request for "reprogramming" of its procurement contract to an ISDA contract, including a

memorandum of understanding between the parties regarding same, agency policy documents

and related correspondence.

**Plaintiff's Request for Additional Documents**

On September 9, 2007, plaintiff's counsel sent a document request to defendant's

counsel, via electronic mail.  Basically, plaintiff's counsel sought a broad expansion of the

Administrative Record.  Specifically, he sought all documents relating to the UNHS contract,

although this entity operates out of a different service unit than Sage (UNHS is in the Kayenta

service unit while Sage is in the Fort Defiance service unit),  the 2005, 2006, and 2007 NAIHS

Fort Defiance Service Unit budgets, including details concerning use of CHS funds, "internal

memoranda" relating to the Sage contract, and other documents. *See* email from Michael Walleri

to William Jaffe, dated September 9, 2007. annexed hereto as Appendix A.

In an effort to move this action forward, and in order to avoid extra motion practice, and

notwithstanding defendants' claim that the Administrative Record that was already filed was

complete, on November 23, 2007 defendant provided certain additional documents to plaintiff at

plaintiff's request.  The additional documents that were provided to plaintiff were:

1.      Initial UNHS contracting documents;

2.      2005-2007 NAIHS Area budget documents showing distribution of CHS funding

and other funding to each IHS and tribally-operated service unit, including CHS

shortfalls, if any; and

3.      2005-2007 NAIHS Ft. Defiance Service Unit budget documents.

Internal memoranda that were withheld on the ground of deliberative process privilege, and/or

attorney client privilege were not produced.  *See* October 26 2007 letter from William B. Jaffe to

13

Michael Walleri, annexed hereto as Appendix B, and the additional documents referenced above,

annexed hereto as Appendix C.

**Plaintiff's Motion for Discovery**

On January 22, 2008, plaintiff filed its motion for permission to conduct discovery (Dkt.

## 18-19).  Plaintiff makes two arguments: a) it should be given wide-ranging discovery beyond

what is appropriate in a district court review of an agency administrative determination, and b)

the administrative record in this action is incomplete in that it should include the contract

provisions provided to the Montezuma Creek tribal organization.  Both arguments are without

merit for the reasons discussed below.

## ARGUMENT

**I.      THE STANDARD OF REVIEW IN THIS CASE IS
         GOVERNED BY THE APA.**

> **A.      Judicial Review Is Governed by the APA in this Action
>          Because the ISDA Authorizes Judicial Review Without
>          Providing Any Standard for that Review.**

Judicial review is governed by the APA in this action because the ISDA does not provide

a standard of review.  Section 450m-1(a) of the ISDA authorizes judicial review by providing

jurisdiction in the United States district courts over "any civil action or claim against the

appropriate Secretary arising under" the ISDA.  25 U.S.C. § 450m-1(a).  The ISDA does not,

however, provide a standard of review to be applied in civil actions arising under the Act.

"When a statute authorizes judicial review of agency action without providing standards for that

review, we look to the APA for guidance."  *Sierra Club v. Glickman*, 67 F.3d 90, 96 (5th Cir.

1995), *citing*, *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983);

14

*Cabinet Mountains Wilderness v. Peterson,* 685 F. 2d 678, 685 (D.C. Cir. 1982).

This general principle finds wide application under a variety of statutes. *See, e.g. United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963) (Wunderlich Act); *Doraiswamy v. Secretary of Labor*, 555 F.2d 832, 839-840 (D.C. Cir. 1976) (Immigration and Nationality Act); *North West Resource Information Center v. National Marine Fisheries Service*, 56 F.3d 1060, 1066 (9th Cir. 1995) (National Environmental Protection Act). The Court of Appeals for the District of Columbia Circuit explained the rationale behind this rule in *Doraiswamy*:

> This circumspection . . . stems from well ingrained characteristics of the administrative process. The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency on the administrative aspects of the litigation. Rather, the judicial function is fundamentally – and exclusively – an inquiry into the legality and reasonableness of the agency's action, matters to be determined solely on the basis upon which the action was administratively projected.

555 F.2d at 839-840 (citations omitted).

As a general matter judicial review of agency action is not *de novo,* but is limited to the administrative record before the agency. *De novo* review is the exception. "The applicability of *de novo* review to administrative actions is limited and is generally not presumed in the absence of statutory language or legislative intent to the contrary. *Cabinet Mountains Wilderness*, 685 F.2d at 685. In *Carlo Bianchi*, 373 U.S. at 715, the Supreme Court explained that

> in cases where congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held.

In two cases directly on point, the courts, after reviewing the text and legislative history

of the ISDA, concluded that review of ISDA contract declinations is on the administrative record. *Yukon-Kuskokwim Health Corporation, Inc., v. Shalala*, Civ. No. 96-155 (JWS) (D. Alaska 1997); *California Rural Indian Health Board, Inc. v. Shalala*, Civ. No. 96-3526 (DLJ) (N.D. Cal. 1997) (*"CRIHB"*).  These two decisions are annexed as Appendices D and E hereto.

The *Yukon* Court stated that it did not believe that "a careful reading of the legislative history [of the ISDA] supports the conclusion that Congress intended *de novo* review of the underlying funding decisions of which plaintiff complains." *Id.*, at 10.  The *Yukon* Court also held that permitting *de novo* review would be "demonstrably impractical in the overall context of the Act." *Id.*, at 10.  The *Yukon* Court explained that *de novo* review "would entangle the court in assessing and balancing policies, programs, and principles of federal appropriations, the details of which no court is equipped to handle." *Id.*, at 11.  Because the ISDA authorizes judicial review of agency action without providing standards for that review, review is under the APA. Plaintiff's arguments to the contrary are without merit and are addressed in the following sections.

> **B.    Congress's Use of the Phrases "Original Jurisdiction" and "Civil Action" Does Not Imply *De Novo* Review.**

Plaintiff wrongfully asserts that the language of the ISDA "weighs heavily in favor of *de novo* review." Pltff's Mem. at 12.  First, plaintiff mistakenly claims that the ISDA's use of the term "original jurisdiction" means that plaintiff is entitled to *de novo* review of the agency administrative actions at issue with full discovery.  *Id.*  The *CRIHB* court convincingly rebutted that argument.  The *CRIHB* court explained "that in conferring original jurisdiction on the district courts Congress merely specified the court in which the action must be brought in the first

16

instance." Id. at 7.  The court went on to explain that "a court with original jurisdiction may exercise essentially appellate powers (as with district court review under the APA), while courts with appellate jurisdiction may conduct *de novo* review (as with an appellate court's review of a district court's conclusions of law)." Id.  The court concluded that "the appropriate standard of review cannot be inferred from the phrase 'original jurisdiction.'" Id.

Similarly, plaintiff errs in claiming that Congress' use of the term "civil action" together with the term "original jurisdiction" requires *de novo* review.  (Pltff's Mem. at 12). "Civil," as defined in Black's Law Dictionary, refers to any type of action that is not criminal, and has nothing to do with trial *de novo* and the availability of discovery or the scope or standard of review.  Blacks Law Dictionary 262 (8th Ed. 2004).

### C. The Fact That Increased Contract Amounts Are Sought under an ISDA Contract Is not Inconsistent with APA Review.

Not surprisingly, the *CRIHB* decision also effectively rebuts the plaintiff's claim that the ISDA cannot provide for APA review because ISDA permits suits for money damages, which are not authorized under the APA.  (Pltff's Mem. at 12-13).  However, plaintiff's argument is based upon a misreading of the ISDA and confusion as to its own claim.  Plaintiff seeks in this action an order that IHS award plaintiff's ISDA full contract proposal.  Plaintiff's action, a suit for the court to review IHS's partial declination of its ISDA contract proposal, is not a suit for money damages.  It is, rather, a suit for specific performance.  *See* 25 U.S.C. 450m-1(a).  The appropriate remedy for these claims "is to force the Agencies to execute the mandate Congress has imposed upon them, in this case, to enter into self-determination contracts." 25 U.S.C. § 450m-1; *CRIHB* at 9.  In *CRIHB*, the court concluded that plaintiffs are simply seeking to enforce

17

the ISDA's mandate.  The same is true here.  The nature of this action is entirely consistent with review under the APA.

        **D.**      **The Discovery Provided by the ISDA in Administrative Hearings Reflects Congressional Intent  That Discovery Should Take Place Prior to Judicial Review in District Court.**

Congress provided for "full discovery" and a "hearing on the record" in *administrative proceedings* regarding an IHS declination under the ISDA,  25 U.S.C. § 450f(b)(3), specifically to address claims that the factual record should be expanded. Plaintiff could have sought the information it seeks now at the administrative hearing stage of this proceeding  – had plaintiff considered it relevant – but it did not do so.   The statute makes plain that discovery is appropriate at the administrative hearing level.

Upon declination, a tribal organization may either proceed directly to district court on the existing record before the agency, or can appeal administratively and obtain a hearing before an Administrative Law Judge pursuant to § 450f(b)(3).  This administrative route is the proper  – and exclusive  – route for plaintiff to take if plaintiff considers it necessary to expand or flesh out the existing record through any type of discovery, and possibly a "hearing on the record."  Stated another way, when a tribal organization receives a declination of a self-determination contract proposal, it may proceed directly to district court for review of the declination on the record that then exists, or, it may appeal administratively and take advantage of its administrative discovery and hearing rights to flesh out the administrative record.  If the tribal organization does not receive satisfactory relief in the administrative hearing, it may then appeal to the district court on the more complete administrative record. 25 U.S.C. § 450f(b)(3).  Plaintiff had this option and chose not to utilize it.

### E.    Plaintiff May Not Rely on the Special Rules of Statutory Interpretation Applicable to Indian Legislation.

Plaintiff also mistakenly claims that it is entitled to *de novo* review because the canon of construction favoring American Indians applies "when there is any ambiguity." (Pltff's Mem. at 14). Courts have recognized that, as a result of the trust relationship between the federal government and Native Americans, ambiguities in statutory language generally should be "resolved in favor of the Indians." *Alaska Pacific Fisheries, Co. v. United States,* 248 U.S. 78, 89 (1918). Plaintiff jumps from this general principle to the conclusion that the provisions in the ISDA with respect to the standard or scope of review must be liberally construed for the benefit of Indians (Pltff's Mem. at 14). There is, however, no ambiguity in the ISDA in connection with the standard or scope of review, as explained above. Because there is simply no suggestion anywhere in the ISDA that discovery or *de novo* review are permitted in federal district court, plaintiff may not rely on the special rules of interpretation applicable to Indian legislation and the APA standard of review governs in this case. [2]

### II.    DISCOVERY AND TRIAL *DE NOVO* ARE NOT PERMITTED UNDER THE APA AND ARE, THUS, NOT APPROPRIATE HERE AND NO EXCEPTIONAL CIRCUMSTANCES PERMIT SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD.

It is black letter law that, except in the rare case, review of agency action under the APA must be based on the record before the agency and, hence, a reviewing court may not go outside

---

[2] For the reasons stated in *Yukon* and *CRIHB,* plaintiff's reliance on *Shoshone-Bannock v. Shalala*, 988 F. Supp. 1306, (D. Oregon 1997) is also misplaced. It was wrongly decided and is contrary to the case law cited above. The *Shoshone* decision is, of course, not binding on this court.

the administrative record.  The APA states that a court reviewing agency action "shall review the whole record or those parts of it cited by a party . . . ."  5 U.S.C. § 706.  Supreme Court decisions hold that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S. Ct. 814, 825 (1971); *see also Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44, 105 S. Ct. 1598, 1607 (1985) (explaining that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court") (*citing Camp v. Pitts,* 411 U.S. 138, 142, 93 S. Ct. 1241, 1244 (1973)).  Because the APA confines judicial review to the administrative record, the reviewing court sits as an appellate tribunal, not as a court authorized to conduct a *de novo* trial and substitute its opinion for that of the agency.  *See United States v. Morgan,* 313 U.S. 409, 422, 61 S. Ct. 999, 1004-05 (1941).  Therefore, even Rule 26 initial disclosures are not appropriate in cases to be decided on an administrative record.  *See* Fed. R. Civ. P. 26(a)(1)(E)(i) (stating that "an action for review on an administrative record" is "exempt from initial disclosure under Rule 26(a)(1)").

The D.C. Circuit has  recognized only very limited circumstances permitting supplementation of the administrative record.  A court may supplement the administrative record upon a finding that there was "such failure to explain administrative action as to frustrate effective judicial review. *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1326 (D.C. Cir. 1984); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981). The D.C. Circuit has also agreed to supplement the record upon a finding that the agency relied on extra-record evidence favorable to its position. *Id.* at 1327, or where there is a "strong

showing of bad faith." *Id.* None of these grounds for supplementation of the administrative record apply here.

Here, there are no grounds to claim that the record is incomplete. Plaintiff has asserted that the ISDA contract awarded to UNHS should be included in the administrative record in this action. (Pltff's Mem. at 16). However, this information is not relevant to the declination decision at issue. UNHS is a different tribal organization located in a different service unit, with a different budget, and it operates out of a different health care facility. The specifics of their ISDA contract are simply not relevant to the declination decision at issue here concerning the plaintiff's request to reprogram funds *from its particular procurement contract to its particular ISDA contract*. Since the UNHS contract is not relevant to the declination decision at issue here, it was not before the administrative agency at the time and it is not appropriate to include it in the administrative record at issue here. *James Madison Ltd, v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *Fund for Animals v. Williams,* 245 F. Supp.2d 49 (D.D.C. 2003). There is simply no allegation that the agency relied on extra-record evidence or operated in bad faith. Hence, no grounds exist to supplement the administrative record.

Additionally, where the record inadequately explains administrative action, the remedy is not discovery by the plaintiff, but an order from the court directing the agency to provide such additional explanation of the reason for the agency decision as may prove necessary. *Alpharma Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).

Finally, and in any event, defendant's anticipated summary judgment motion will resolve this action based upon the administrative record that has already been filed. The summary judgment motion will demonstrate that the grounds provided for declination were proper. Thus,

there will be no need for additional discovery and this court should deny plaintiff's motion to

permit discovery and to supplement the administrative record.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for discovery should be denied.

Dated: March 7, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

 s/ William B. Jaffe (Electronic Filing)
SHEILA M. LIEBER
Deputy Director
WILLIAM B. JAFFE
Trial Attorney

United States Department of Justice
Civil Division,  Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, DC  20044
Delivery Address
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
        Email: william.jaffe@usdoj.gov

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2008 I served, via electronic mail, a copy of Defendants'

Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Discovery,

addressed to:

JOEL D. JOSEPH
Law Offices of Joel D. Joseph
Bar No. 183830
7272 Wisconsin Avenue, Suite 300
Bethesda, MD 20814
301-941-1989
joeljoseph@gmail.com

MICHAEL J. WALLERI
Law Offices of Michael J. Walleri
330 Wendell Street, Suite E
Fairbanks, AK 99701
907-452-4716
walleri@gci.net

March 7, 2008

/s/William B. Jaffe

WILLIAM B. JAFFE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NAVAJO HEALTH FOUNDATION d/b/a SAGE MEMORIAL HOSPITAL, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. Action No. 1:07-00151 (RWR) |
| | ) ECF |
| MICHAEL O. LEAVITT, Secretary, United States Department of Health and Human Services, and THE UNITED STATES OF AMERICA, | ) ) ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION TO PERMIT DISCOVERY**

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

 s/ William B. Jaffe (Electronic Filing)
SHEILA M. LIEBER
Deputy Director
WILLIAM B. JAFFE
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
<u>Delivery Address</u>
20 Massachusetts Avenue, NW, Room 6110
Washington, DC 20530
(202) 353-7633
Fax: (202) 616-8460
        Email: william.jaffe@usdoj.gov

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    General Provisions of ISDA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Funding Of Self-Determination Contracts Under ISDA. . . . . . . . . . . . . . . . . . 6

        1.    The "Secretarial Amount". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.    Contract Support Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    Contract Health Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Procedural History of this Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Plaintiff's Request for Additional Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Plaintiff's Motion for Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.    THE STANDARD OF REVIEW IN THIS CASE IS GOVERNED
    BY THE APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    Judicial Review Is Governed by the APA in this Action Because
        the ISDA Authorizes Judicial Review Without Providing Any
        Standard for that Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    Congress's Use of the Phrases "Original Jurisdiction" and "Civil
        Action" Does Not Imply *De Novo* Review. . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    The Fact That Increased Contract Amounts Are Sought under an
        ISDA Contract Is not Inconsistent with APA Review. . . . . . . . . . . . . . . . . . 17

    D.    The Discovery Provided by the ISDA in Administrative Hearings
        Reflects Congressional Intent  That Discovery Should Take Place
        Prior to Judicial Review in District Court. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i.

E.    Plaintiff May Not Rely on the Special Rules of Statutory
Interpretation Applicable to Indian Legislation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19


II.    DISCOVERY AND TRIAL *DE NOVO* ARE NOT PERMITTED
UNDER THE APA AND ARE, THUS, NOT APPROPRIATE HERE
AND NO EXCEPTIONAL CIRCUMSTANCES PERMIT
SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD. . . . . . . . . . . . . . . . 19

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                                    **<u>PAGE(S)</u>**

*Alaska Pacific Fisheries, Co. v. United States*, 248 U.S. 78 (1918). . . . . . . . . . . . . . . . . . . . . .  19

*Alpharma Inc. v. Leavitt*, 460 F.3d 1 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983). . . . . . . . . . . . . .  14

*Cabinet Mountains Wilderness v. Peterson,* 685 F. 2d 678 (D.C. Cir. 1982). . . . . . . . . . . . . .  15

*California Rural Indian Health Board, Inc. v. Shalala,*
Civ. No. 96-3526 (DLJ)(N.D. Cal. 1997) (*"CRIHB"*). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,
    91 S. Ct. 814 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Doraiswamy v. Secretary of Labor*, 555 F.2d 832 (D.C. Cir. 1976). . . . . . . . . . . . . . . . . . . .  15

*Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275 (D.C. Cir. 1981). . . . . . . . . . .  20, 21

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 105 S. Ct. 1598 (1985). . . . . . . . . . . . .  20

*Fund for Animals v. Williams,* 245 F. Supp.2d 49 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . .  21

*James Madison Ltd, v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . .  21

*North West Resource Information Center v. National Marine*
    *Fisheries Service*, 56 F.3d 1060 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287 (D.C. Cir. 1984). . . . . . . . . . . . .  20

*Shoshone-Bannock v. Shalala*, 988 F. Supp. 1306 (D. Oregon 1997). . . . . . . . . . . . . . . . . . . .  19

*Sierra Club v. Glickman,* 67 F.3d 90 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*United States v. Carlo Bianchi & Co.*, 373 U.S. 709 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*United States v. Morgan*, 313 U.S. 409, 61 S. Ct. 999 (1941). . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Yukon-Kuskokwim Health Corporation, Inc., v. Shalala,*
    Civ. No. 96-155 (JWS) (D. Alaska 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

## STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

25 U.S.C. § 450. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

25 U.S.C. § 450a(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

25 U.S.C. § 450b(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 9

25 U.S.C. § 450f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5, 9, 18

25 U.S.C. § 450f(a)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

25 U.S.C. § 450f(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

25 U.S.C. § 450f, section 102(a)(2)(A-E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

25 U.S.C. § 450j-1(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

25 U.S.C. § 450j-1(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

25 U.S.C. § 450j-1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

25 U.S.C. § 450m-1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 14, 17

25 U.S.C. § 458aaa-18(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Pub. L. No. 100-472, § 205, 101 Stat. 2293. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Pub. L. No. 109-54, 119 Stat. 499, 540. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

S. Rep. No. 274. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 26(a)(1)(E)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Rule 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Rule 26(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

APPENDIX "A"

## Jaffe, William (CIV)

| | |
|---|---|
| **From:** | Michael J. Walleri [walleri@gci.net] |
| **Sent:** | Sunday, September 09, 2007 7:32 PM |
| **To:** | Jaffe, William (CIV) |
| **Cc:** | Joel Joseph |
| **Subject:** | Re: NHF/Sage v. Leavitt et al |
| **Attachments:** | Settlement Outline.doc |

I have completed my initial review of the administrative record. Unfortunately, the administrative record is not complete as to the issues presented. In particular, IHS is claiming that it could not engage in a budget reallocation similar to that which facilitated the Montezuma Creek contract. There is nothing in the record which addresses this issue. As I indicated in our initial discussions, we believe that these items need to be in the administrative record. In particular, the record does not contain any NAIHS budget information, particularly, NAIHS contract health budget information, including any contract health short falls within the NAIHS, and IHS, which would have been aided by intra-agency budget transfers. I have discussed this with some other people working in the area, and it appears that a number of agencies and areas experienced budget short falls in contract health, which may have been aided by an inter-budget transfer. There is nothing in the record about efforts by IHS to examine the possibilities to effectuate inter/intra area budget transfers.

I would also note that there are no internal memorandum relating to the Sage Contract issues. It does not seem possible that the Sage contracting process did not generate any internal memorandum. In particular, NAIHS made several references to legal positions and advise its office of general counsel related to the process. None of these documents were included.

I would like to see the following added to the
* initial Montezuma Creek contracting documents, including re-budgeting and re-programing documentation
* 2005, 2006 and 2007 NAIHS, Ft. Defiance Agency budget documents, including budget detail dealing with
      a) contract health
      b) carry over funding
* internal memorandum relating to the Sage contract
* internal legal memorandum relating to the Sage contract issues.

If this is not acceptable, we will file a motion on the matter. Alternatively, we can file FOI requests to obtain the information. This seems to be a tedious way of dealing with it, and it might be better to simply agree. May I suggest a teleconference next week to discuss this.

On the issue of settlement, I have included a draft settlement outline which might be the basis of some settlement discussions. I have noted that the NAIHS has indicated that they are attempting re-programing for next year, which might facilitate a settlement. In reviewing the appropriation bills, it is not readily apparent if the amounts available would enable the fund transfers/re-programing per the DHSS understanding of appropriation law. The next year proposed budget does propose increases in IHS budget that would clearly allow the contract, if that is actually necessary. Please advise if any of these ideas have receptivity in the agency.

I am assuming that you will be filing the adminstrative record on Tuesday. We should probably set up a teleconference call if you would like further discussions on this.

Jaffe, William (CIV) wrote:

> Mike,
>
> Please let me know when you have completed your review of the administrative record in the above matter, hopefully by the end of August. As you know, the administrative record must be filed as of September 11,

2007 pursuant to the court's prior order.

Thank you,

Bill

--
William B. Jaffe
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
Tel:  202-353-7633
Fax: 202-616-8460
email: william.jaffe@usdoj.gov

*The information in this transmittal (including attachments, if any) is intended only for the recipient(s) listed above and may contain information that is privileged and confidential. Any review, use, disclosure, distribution, or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately and destroy all copies of the transmittal. Your cooperation is appreciated.*

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.484 / Virus Database: 269.12.1/963 - Release Date: 8/20/2007 5:44 PM

APPENDIX "B"



**U.S. Department of Justice**

Civil Division, Federal Programs Branch

20 Massachusetts Ave., NW
Washington, D.C. 20035

---

William B. Jaffe                                                          Tel: 202/353-7633
Trial Attorney                                                           Fax: 202/616-8460

October 26, 2007

**VIA Email and U.S. Mail**
Michael Walleri, Esq.
330 Wendell Street, Suite E
Fairbanks, AK 99701

      Re:    <u>NHF/Sage v. Leavitt, et al.,</u> Civil Action No. 1:07-00151 (RWR)

Dear Mr. Walleri:

      I am writing to follow up on the conversation we had on October 2, 2007 and respond to your letter of the same date.

<u>Availability of Discovery and Scope of the Administrative Record</u>

      You have requested additional documents which you claim should be included in the administrative record. In an effort to narrow the areas of disagreement, and avoid extra motion practice to the extent possible, we have requested, and expect to be able to provide the following documents to the extent that they are available and not privileged:

    1.       Initial Montezuma Creek contracting documents;

    2.       2005-2007 Area budget documents showing distribution of H & C and CHS funding to each IHS and tribally-operated service unit, including CHS shortfalls, if any; and

    3.       2005-2007 Ft. Defiance Service Unit budget documents.

      As my prior letter dated September 21, 2007 explained, we will not provide any documents that are withheld on the grounds of deliberative process privilege or attorney client privilege such as, but not limited to, "internal memorandum relating to the Sage contract" and "internal legal memorandum relating to the Sage contract issues." We expect to be able to provide documents listed above, to the extent they are available and not privileged, no later than November 15, 2007.

      However, as I told you, we do not agree that these additional documents are appropriate for inclusion in the Administrative Record. We also do not agree that discovery is appropriate in this action. Rather, review should be limited to the Administrative Record that has been filed in this action. Please see my prior letter to you on this topic dated September 21, 2007.

                    Very truly yours,

                    WILLIAM B. JAFFE
                    Trial Attorney

**APPENDIX "C"**



**U.S. Department of Justice**

Civil Division, Federal Programs Branch

20 Massachusetts Ave., NW
Washington, D.C. 20035

---

William B. Jaffe                                                                    Tel: 202/353-7633
Trial Attorney                                                                      Fax: 202/616-8460

November 23, 2007

**VIA Fed Ex**
Michael Walleri, Esq.
330 Wendell Street, Suite E
Fairbanks, AK 99701

       Re:    <u>NHF/Sage v. Leavitt, et al.,</u> Civil Action No. 1:07-00151 (RWR)

Dear Mr. Walleri:

      Enclosed are the following documents that we agreed to provide to you pursuant to our prior correspondence on this matter.

1.     Initial Montezuma Creek contracting documents;
2.     2005-2007 Area budget documents showing distribution of H & C and CHS funding to each IHS and tribally-operated service unit, including CHS shortfalls, if any; and
3.     2005-2007 Ft. Defiance Service Unit budget documents.

      As my prior correspondence also described, we do not agree that these additional documents are appropriate for inclusion in the Administrative Record. We also do not agree that discovery is appropriate in this action. Rather, review should be limited to the Administrative Record that has been filed in this action. Please see my prior letter to you on this topic, dated September 21, 2007.

                        Very truly yours,

                        WILLIAM B. JAFFE
                        Trial Attorney

# 1. Initial Montezuma Creek contracting documents

# SELF-DETERMINATION CONTRACT

## BETWEEN

## THE UTAH NAVAJO HEALTH SYSTEM, INC.

## AND THE SECRETARY OF THE

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### ARTICLE I

### Authority and Purpose

**SECTION 1 – AUTHORITY.**  This agreement, denoted a Self-Determination Contract (hereinafter "Contract"), is entered into by the Secretary of the Department of Health and Human Services (hereinafter the "Secretary"), for and on behalf of the United States pursuant to Title I of the Indian Self-Determination and Education Assistance Act, as amended (P.L. 93-638, 25 U.S.C. §450 *et seq.*) (hereinafter "ISDA") and by the Utah Navajo Health System, Inc. (hereinafter "UNHS"). The provisions of Title I of the ISDA are incorporated in this agreement.  All terms of this Contract shall be governed by the ISDA and the implementing regulations.  To the extent that any term in this Contract may be construed as being inconsistent with the ISDA or exceeding the authority of the ISDA, the provisions of the ISDA shall govern.

### SECTION 2  -  PURPOSE.

**(A)  Policy.**   This Contract is to carry out a meaningful self-determination policy as authorized by Title I of the ISDA, which will permit an orderly transition from the federal domination of programs for, and services to, Indians to effective and meaningful participation by the UNHS and its Board of Directors in the planning, conduct, and administration of those programs and services (25 U.S.C. Section 450a(b)); and to maintain and improve the health of the Navajo Tribal members consistent with and as required by the Federal Government's historical and unique legal relationship to the Navajo Nation and its members (25 U.S.C. Section 1601(a)).

**(B)  In General.**   Each provision of the Indian Self-Determination and Education Assistance Act (25 U.S.C. §450 et seq.) and each provision of this Contract shall be liberally construed for the benefit of the UNHS to transfer the following  programs, functions, services, and activities (hereinafter PFSAs), or portions thereof, and associated resources, that are otherwise contractible under section 102(a) of such Act, including all related administrative functions, from the Federal Government to the UNHS.

     (C)  **Specific responsibilities.**   As provided in the Annual Funding Agreement (hereinafter AFA), the UNHS shall operate and administer the PFSAs identified in the AFA at facilities operated by the UNHS. The operation of these PFSAs will be provided on a schedule agreed to by and between the parties through the applicable AFA and any amendments thereto. The determination of the priority and amounts of funds to be utilized for each PFSA shall be the responsibility of the UNHS except as limited by law.

## ARTICLE II

### Terms, Provisions and Conditions

     **SECTION 1 - TERM.**  Pursuant to section 105(c)(1) of the ISDA (25 U.S.C. §450j(c)(1)), the term of this Contract shall be three (3) years and two and one-half months. The additional two and one-half months are being allowed in order to permit UNHS to transition to a Federal fiscal year beginning October 1 and ending September 30 of the following year; provided, however, that the initial AFA term shall begin on July 15, 2002 and end on July 14, 2003; the next funding period shall extend from July 15, 2003 to September 30, 2003; and, thereafter, all subsequent AFA funding periods shall correspond with the Federal fiscal year.

     **SECTION 2 - EFFECTIVE DATE.**  This Contract shall become effective on July 15, 2002.

     **SECTION 3 - PROGRAM STANDARDS.**  The UNHS agrees to administer the PFSAs (or portions thereof) listed in Article I, Section 2 of this Contract in conformity with national certifying and accrediting agencies and professional associations, including the Health Resources and Services Administration, and the Centers for Medicare and Medicaid Services.

     **SECTION 4 - FUNDING AMOUNT.**  Subject to the availability of appropriations, the Secretary shall make available to the UNHS the total amount specified in the AFA incorporated by reference in Article VI, Section 2. Such amount shall not be less than the applicable amount determined pursuant to section 106(a) of the ISDA (25 U.S.C. §450j-1).

     **SECTION 5 - LIMITATION OF COSTS.**  The UNHS shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under this Contract. If, at any time, the UNHS has reason to believe that the total amount required for performance of this Contract or a specific activity conducted under this Contract would be greater than the amount of funds awarded under this Contract, the UNHS shall provide reasonable notice to the Secretary of HHS. If the Secretary does not take such action as may be necessary to increase the amount of funds awarded

under this Contract, the UNHS may suspend performance of the Contract until such time as additional funds are awarded.

## SECTION 6 – PAYMENT.

**(A)    In General.**  Payments to the UNHS under this Contract shall

(i)    be made as expeditiously as practicable; and

(ii)    include financial arrangements to cover funding during periods covered by joint resolutions adopted by Congress making continuing appropriations, to the extent permitted by such resolutions.

**(B)    Payment Schedule.**

(i)    Pursuant to section 108(b) of the ISDA, and notwithstanding any other provision of law, for each fiscal year covered by this Contract, the Secretary shall make available to the UNHS the funds specified for the fiscal year under the AFA incorporated by reference in Article VI, Section 2 by paying to the UNHS an annual lump-sum payment of those funds that are recurring to the Navajo Area IHS. Payment of such funds shall be made not later than the date that is twenty (20) calendar days after the date on which the Office of Management and Budget apportions the appropriations for the fiscal year for the PFSAs subject to this Contract, or ten (10) days after the first day of the Contract term, whichever is later. Competitive, formula, and other funds that require further calculation shall be paid within ten (10) calendar days of the date on which the Area Director reaches a final allocation decision following tribal consultation, or ten (10) calendar days after the first day of the Contract term, whichever is later. Such allocation decisions shall be made no later than twenty (20) calendar days after the date on which the funds are adviced to the Navajo Area.

(ii)    Interest on Advances. The UNHS shall be permitted to retain interest earned on funds advanced pending disbursement by the UNHS as provided in section 105(b) of the ISDA (25 U.S.C. 450j(b)). Interest earned on the funds due under this Contract shall be used as program income for health purposes and shall not diminish the amount of funds the UNHS is authorized to receive under the AFA in the year earned or in subsequent fiscal years.

### SECTION 7 – RECORDS AND MONITORING.

**(A) In General.**   Except for previously provided copies of tribal records that the Secretary demonstrates are clearly required to be maintained as part of the recordkeeping system of the Department of the Interior or the Department of Health and Human Services (or both), and except as otherwise provided in section 10 of the AFA, records of the UNHS shall not be considered Federal records for purposes of chapter 5 of title 5, United States Code.

**(B) Recordkeeping System.**  The UNHS shall maintain a recordkeeping system and, upon reasonable advance request, provide reasonable access to such records to the Secretary.

**(C) Responsibilities of Contractor.**  The UNHS shall be responsible for managing the day-to-day operations conducted under this Contract and for monitoring activities conducted under this Contract to ensure compliance with the Contract and applicable Federal requirements. With respect to the monitoring activities of the Secretary, the routine monitoring visits shall be limited to not more than two performance monitoring visits for this contract, by the head of each operating division, departmental bureau, or departmental agency, or duly authorized representative of such head unless

   (i)    the UNHS agrees to one or more additional visits; or

   (ii)    the appropriate official determines that there is reasonable cause to believe that grounds for reassumption of the Contract or suspension of Contract payments, or other serious Contract performance deficiency may exist.

No additional visit referred to in clause (ii) shall be made until such time as reasonable advance notice that includes a description of the nature of the problem that requires the additional visit has been given to the UNHS.

**(D) HIPAA Compliance.**  The relationship created by this Self-Determination Contract may implicate the privacy regulations promulgated pursuant to the Health Insurance Portability and Accountability Act (HIPAA). The parties will amend this Contract or enter into a new contract to comply with those regulations on or before April 14, 2003 or such other date on which those regulations become fully effective.

### SECTION 8 - PROPERTY.

**(A) In General.**  As provided in section 105(f) of the ISDA (25 U.S.C. 450j(f)), at the request of the UNHS, the Secretary may make available, or transfer to the UNHS, all reasonably divisible

real property, facilities, equipment, and personal property that the Secretary has used to provide or administer the PFSAs covered by this Contract at such time as those PFSAs are assumed by the UNHS. A mutually agreed upon list specifying property, facilities, and equipment so furnished shall also be prepared by the Secretary, with the concurrence of the UNHS, and periodically revised by the Secretary, with the concurrence of the UNHS.

      **(B)  Records.**   The UNHS shall maintain a record of all property referred to in subparagraph (A) or other property acquired by the UNHS under section 105(f)(2)(A) of the ISDA for purposes of replacement.

      **(C)  Joint Use Agreements.**   Upon the request of the UNHS, the Secretary and the UNHS shall enter into a separate joint use agreement to address the shared use by the parties of real or personal property that is not reasonably divisible.

      **(D)  Acquisition of Property.**  The UNHS is granted the authority to acquire such excess property as the UNHS may determine to be appropriate in the judgment of the UNHS to support the PFSAs operated pursuant to this Contract.

      **(E)  Confiscated or Excess Property.**  The Secretary shall assist the UNHS in obtaining such confiscated or excess property as may become available to tribes, tribal organizations, or local governments.

      **(F)  Screener Identification Card.**  A screener identification card (General Services Administration form numbered 2946) or appropriate documentation shall be issued to the UNHS not later than the effective date of this Contract. The designated official shall, upon request, assist the UNHS in securing the use of the card or such appropriate documentation.

      **(G)  Capital Equipment.**  The UNHS shall determine the capital equipment, leases, rentals, property, or services required to perform the obligations of the UNHS under this subsection, and shall acquire and maintain records of such capital equipment, property rentals, leases, property, or services through applicable procurement procedures of the UNHS.

     **SECTION 9 - AVAILABILITY OF FUNDS.**  Notwithstanding any other provision of law, any funds provided under this Contract —

      **(A)**     shall remain available until expended; and

      **(B)**     with respect to such funds, no further -

       (i)      approval by the Secretary, or

       (ii)     justifying documentation from the UNHS, shall be required prior to the expenditure of such funds.

    **(C)**    with respect to carryover funds, shall not reduce or diminish the amount of funds due the UNHS under each AFA.

## SECTION 10 - TRANSPORTATION AND OTHER FEDERAL SUPPLY SOURCES.

**(A) Use of Motor Vehicles.**   Beginning on the effective date of this Contract, the Secretary shall authorize the UNHS to obtain interagency motor pool vehicles and related services for performance of any PFSAs assumed by the UNHS and carried out under this Contract.

**(B) Federal Supply Sources.**   Pursuant to section 105(k) of the ISDA (25 U.S.C. 450j(k), for purposes of section 201(a) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 481 (a)) relating to General Services Administration (GSA) and other Federal sources of supply, including lodging providers, airlines, and other transportation providers, the UNHS shall be deemed an executive agency and part of the Indian Health Service when carrying out PFSAs it has assumed under this Contract, and the employees of the UNHS shall be eligible to have access to sources of supply on the same basis as employees of an executive agency have such access.

## SECTION 11 – PROGRAM GUIDELINES, MANUALS OR POLICY DIRECTIVES.
Except as specifically provided in the ISDA, the UNHS is not required to abide by guidelines, manuals, or policy directives of the Secretary, unless otherwise agreed to by the UNHS and the Secretary, or otherwise required by law.

## SECTION 12 – DISPUTES.

**(A) Third-Party Mediation Defined.**   For the purposes of this Contract, the term "third-party mediation" means a form of mediation whereby the Secretary and the UNHS nominate a third party who is not employed by or significantly involved with the Secretary of Health and Human Services, or the UNHS, to serve as a third-party mediator to mediate disputes under this Contract.

**(B) Alternative Procedures.**   In addition to, or as an alternative to, remedies and procedures prescribed by section 110 of the ISDA (25 U.S.C. §450m-l), the parties to this Contract may jointly--

       (i)      submit disputes under this Contract to third-party mediation;

(ii)    submit the dispute to the adjudicatory body of the Navajo Nation, including the Navajo Nation Tribal court;

(iii)    submit the dispute to mediation processes provided for under the laws, policies, or procedures of the UNHS; or

(iv)    use the administrative dispute resolution processes authorized in subchapter IV of chapter 5 of title 5, United States Code.

**(C) Effect of Decisions.**  The Secretary shall be bound by decisions made pursuant to the processes set forth in subparagraph (B), except that the Secretary shall not be bound by any decision that significantly conflicts with the interests of the Indians, including Navajo tribal members, or the United States.

**SECTION 13 - ADMINISTRATIVE PROCEDURES OF UNHS.**  Pursuant to the Indian Civil Rights Act of 1968 (25 U.S.C. §1301 et seq.), policies and procedures of the UNHS shall provide for administrative due process (or the equivalent of administrative due process) with respect to PFSAs that are provided by the UNHS pursuant to this Contract.

**SECTION 14 - SUCCESSOR ANNUAL FUNDING AGREEMENT.**

**(A) In General.**  Negotiations for a successor AFA, provided for in Article VI, Section 2, shall begin not later than 120 days prior to the conclusion of the preceding AFA, except for the first year of this Contract. Except as provided in section 105(c)(2) of the ISDA (25 U.S.C. §450j (c)(2)), the funding for each such successor AFA shall only be reduced pursuant to section 106(b) of such Act (25 U.S.C. §450j-I(b)). If the parties are unable to conclude negotiation of a successor AFA, the terms of this Contract and the existing AFA shall, at the option of the UNHS, continue on in 30 or 90 day increments until a successor AFA is agreed to. Any increases in funding to which the UNHS is entitled by statute, or increases which the UNHS subsequently negotiates, shall be included in the successor AFA.

**(B) Information.**  The Secretary shall prepare and supply relevant information, and promptly comply with any request by the UNHS for information that the UNHS reasonably needs to determine the amount for funds that may be available for a successor AFA, as provided for in Article VI, Section 2 of this Contract.

**SECTION 15 - CONTRACT REQUIREMENTS; APPROVAL BY SECRETARY.**

**(A) In General.**  Except as provided in subparagraph (B), for the term of the Contract, section 2103 of the Revised Statutes (25 U.S.C. § 81) and section 16 of the Act of June 18, 1934 (48

Stat. 987, chapter 576; 25 U.S.C. §476), shall not apply to any contract entered into in connection with this Contract.

**(B) Requirements.** Each contract entered into by the UNHS with a third party in connection with performing the obligations of the UNHS under this Contract shall

(i)     be in writing;

(ii)    identify the interested parties, the authorities of such parties, and purposes of the contract;

(iii)   state the work to be performed under the contract; and

(iv)    state the process for making any claim, the payments to be made, and the terms of the contract, which shall be fixed.

## ARTICLE III

## Obligations of the Utah Navajo Health System, Inc.

**SECTION 1 - CONTRACT PERFORMANCE.** Except as provided in Article IV, Section 3 of this Contract, the UNHS shall administer and perform the PFSAs identified in Article I, Section 2 of this Contract and funded through the AFA incorporated into this Contract in Article VI, Section 2 of this Contract.

**SECTION 2 - AMOUNT OF FUNDS.** The total amount of funds to be paid under this Contract pursuant to section 106(a) shall be determined in an AFA entered into between the Secretary and the UNHS, which shall be incorporated into this Contract pursuant to Article VI, Section 2 of this Contract.

**SECTION 3 - CONTRACTED PROGRAMS.** Subject to the availability of appropriated funds, the UNHS shall administer the PFSAs identified in this Contract and funded through the AFA hereunder, and/or any amendments or attachments thereto.

## SECTION 4 - TRUST SERVICES FOR INDIVIDUAL INDIANS.

**(A) In General.** To the extent that the AFA provides funding for the delivery of trust services to individual Indians that have been provided by the Secretary, the UNHS shall maintain at least the same level of service as the Secretary provided for such individual Indians, subject to the availability of appropriated funds for such services.

      **(B) Trust Services to Individual Indians.**  For the purposes of this paragraph only, the term "trust services for individual Indians" means only those services that pertain to land or financial management connected to individually held allotments.

      **SECTION 5 - FAIR AND UNIFORM SERVICES.**  The UNHS shall provide services under this Contract in a fair and uniform manner and shall provide access to an administrative or judicial body empowered to adjudicate or otherwise resolve complaints, claims, and grievances brought by program beneficiaries against the UNHS arising out of the performance of the Contract.

      **SECTION 6 - MERGING WITH OTHER PROGRAMS.**  The UNHS may merge PFSAs provided under its AFA with other PFSAs provided with its own funds or funds from other sources. In such cases, the UNHS shall not be required to separate funds for PFSAs so long as the UNHS can provide sufficient data to permit an acceptable program financial audit to be conducted in accordance with the Single Agency Audit Act and any applicable circulars issued by the Office of Management and Budget.

      **SECTION 7 - PROGRAM INCOME.**  All program income collected by the UNHS shall be treated as additional supplemental funding to that negotiated in the AFA and the UNHS may retain all such income pursuant to section 106(m) of the Act. Such program income shall not result in any off-set or reduction in the negotiated amount of the current or successor AFAs.

**ARTICLE IV**

**Obligations of the United States**

**SECTION 1 - TRUST RESPONSIBILITY.**

      **(A) In General.**  The United States reaffirms the trust responsibility of the United States to the Navajo Nation to protect and conserve the trust resources of the Navajo Nation and the trust resources of individual Indians.

      **(B) Construction of Contract.**  Nothing in this Contract may be construed to terminate, waive, modify, or reduce the trust responsibility of the United States to the Navajo Nation or individual Indians. The Secretary shall act in good faith in upholding such trust responsibility.

      **SECTION 2 - GOOD FAITH.**  Within available funds, the Secretary shall act in good faith in cooperating with the UNHS to achieve the goals set forth in the Indian Health Care Improvement Act (25 U.S.C. §1601 *et seq.*).

      **SECTION 3 - PROGRAMS RETAINED.**

(A)     As specified in the AFA, the United States hereby retains the PFSAs with respect to the UNHS that are not specifically assumed by the UNHS in the AFA incorporated under Article VI, Section 2, or by the Navajo Nation. The UNHS shall continue to be entitled to the full benefits of any such retained PFSAs. Programs retained by the IHS, except those required to carry out federal functions, are retained based on the agreement of the UNHS, and the UNHS retains the right to assume all or part of such PFSAs pursuant to the provisions of the ISDA .

(B)     No later than 180 days prior to the end of each AFA, the IHS shall provide the UNHS with a written list of the retained PFSAs relative to health care that will benefit the Navajo tribal members for the upcoming fiscal year. To the fullest extent permitted by law, the Secretary shall provide the UNHS access to, and copies of, all documents and other information relevant to any ongoing retained PFSAs and shall cooperate with any evaluation which the UNHS may wish to conduct of such activities. The Secretary shall cooperate with the UNHS  to facilitate the inclusion of PFSAs in future AFAs.

**SECTION 4 - TECHNICAL ASSISTANCE.**   The Secretary shall provide requested technical assistance and information to the UNHS necessary to carry out this Agreement to the extent that sufficient residual and nonresidual resources are available to the Secretary to provide such assistance. In addition, the UNHS will routinely be provided information made available to NAIHS regarding any special initiatives or technology developed by the Indian Health Service.

**SECTION 5 - LEASING OF TRIBAL FACILITIES.**   Pursuant to section 105(l) of the Act, upon the request of the UNHS, the UNHS and the Secretary shall enter into a lease agreement for any UNHS operated facilities used for the administration and delivery of services under this Contract.

**ARTICLE V**

**Other Provisions**

**SECTION 1 - DESIGNATED OFFICIALS.**   Not later than the effective date of this Contract, each party shall provide the other written designation of a senior official to serve as a representative for notices, proposed amendments to the Contract, and other purposes for this Contract.

**SECTION 2 - CONTRACT MODIFICATIONS OR AMENDMENT.**

(A) **In General.**   Except as provided in subparagraph (B), no modification to this Contract shall take effect unless such modification is made in the form of a written amendment to the Contract, and the UNHS and the Secretary provide written consent for the modification.

(B) **Exception.** The addition of supplemental funds for PFSAs (or portions thereof) already included in the AFA incorporated under Article VI, section 2, and the reduction of funds pursuant to section 106(b)(2), shall not be subject to subparagraph (A).

**SECTION 3 - OFFICIALS NOT TO BENEFIT.** No member of Congress, or resident commissioner, shall be admitted to any share of part of any contract executed pursuant to this Contract, or to any benefit that may arise from such contract. This paragraph may not be construed to apply to any contract with a third party entered into under this Contract if such contract is made with a corporation for the general benefit of the corporation.

**SECTION 4 - COVENANT AGAINST CONTINGENT FEES.** The parties warrant that no person or selling agency has been employed or retained to solicit or secure any contract executed pursuant to this Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the UNHS for the purpose of securing business.

**SECTION 5 - USE OF FEDERAL EMPLOYEES.** Section 104 of the Indian Self-Determination and Education Assistance Act, as amended, shall apply to this Contract and to any individuals assigned or detailed or leaving the federal employment to perform services under this Contract.

**SECTION 6 - INSURANCE AND FEDERAL TORT CLAIMS ACT COVERAGE.**

(A) The Federal Tort Claims Act applies to the PFSAs assumed by the UNHS and carried out under this Contract to the extent provided in Section 102(c) of the ISDA and as set forth in 25 C.F.R. Sections 900.180 through 900.210.

(B) For purposes of Federal Tort Claims Act coverage, the UNHS is deemed to be a part of the Indian Health Service in the Department of Health and Human Services and its employees are deemed by statute to be employees of the Federal government when acting within the scope of their employment in carrying out this Contract or the AFA. This status is not changed by the source of the funds used by the UNHS to pay the employee's salary and benefits as long as the employee does not receive additional compensation for the performance of covered services from anyone other than the UNHS.

(C) Individuals hired by the UNHS under personal services contracts to provide health care services in a facility owned, operated or constructed under the jurisdiction of the Indian Health Service are covered by the Federal Tort Claims Act in accordance with Section 102(d) of the ISDA and 25 C.F.R. Section 900.193. UNHS may also enter into personal services contracts with organizations or entities and the individuals providing services under such contracts would be covered by the FTCA to the extent provided by 25 U.S.C. section 1638c and other applicable law.

(D) Funds provided under the AFA may be used to purchase such additional liability and other insurance as is prudent in the judgment of the UNHS performing under this Contract and AFA for its protection and the protection of its employees.

**SECTION 7 - APPLICABILITY OF FEDERAL CONTRACT AND OTHER LAWS.** This contract is not subject to Federal contracting or cooperative agreement laws (including any regulations) except to the extent that such laws expressly apply to Indian tribes.

**SECTION 8 - INDIAN PREFERENCE.** In accordance with sections 7(b) and (c) of the ISDA, the UNHS will give preference to members of the Navajo Tribe and to other Indians in employment in accordance with applicable law.

**SECTION 9 - RETROCESSION.** The retrocession provisions of Section 105(e) of the ISDA, as amended and 25 C.F.R. Sec. 900.240 *et seq.* are herein adopted.

**SECTION 10 – REASSUMPTION.** The Secretary shall only reassume PFSAs pursuant to Section 109 of the ISDA.

**SECTION 11 - SOVEREIGN IMMUNITY.** Nothing in this Contract or in each AFA shall be construed to waive the sovereign immunity of the Navajo Nation.

**SECTION 12 - SEVERABILITY.** This Contract shall not be considered invalid, void or voidable if any section or provision of this Contract is found to be invalid, unlawful or unenforceable by a court of competent jurisdiction.

## ARTICLE VI

## Attachments

**SECTION 1 - APPROVAL OF CONTRACT.** The resolution of the Navajo Nation Council authorizing the contracting of the PFSAs identified in this Contract is attached to this Contract as Attachment 1.

**SECTION 2 - ANNUAL FUNDING AGREEMENTS.**

(A) **In General.** The AFA under this Contract shall only contain

Self-Determination Contract between UNHS and IHS                    **Page 13**

(i) terms that identify the PFSAs to be performed or administered, the general budget category assigned, the funds to be provided, and the time and method of payment; and

(ii) such other provisions, including a brief description of the PFSAs to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree.

**(B) Incorporation by Reference.** The AFA is hereby incorporated in its entirety in this Contract and attached to this Contract as Attachment 2.

DATED this __10__ day of __July__ 2002.

UTAH NAVAJO HEALTH SYSTEM, INC.        UNITED STATES OF AMERICA, DEPARTMENT OF HEALTH AND HUMAN SERVICES, INDIAN HEALTH SERVICE

_____        _____
Manuel Morgan, Chairperson          John Hubbard, Jr., Area Director
UNHS Board of Directors             Navajo Area Indian Health Service

                                    _____
                                    David Tarro, Contracting Officer
                                    Navajo Area Indian Health Service

# ANNUAL FUNDING AGREEMENT

## BETWEEN

## THE UTAH NAVAJO HEALTH SYSTEM, INC.

## AND

## THE SECRETARY OF THE

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## FISCAL YEAR 2002

**SECTION 1 – AUTHORITY AND PURPOSE.** This Annual Funding Agreement (AFA) is executed by and between Utah Navajo Health System, Inc. (hereafter "UNHS") on behalf of the Navajo Nation, and the Secretary of the Department of Health and Human Services, acting through the Indian Health Service (hereafter "IHS"), pursuant to Title I of the Indian Self-Determination and Education Assistance Act (PL. 93-638, 25 U.S.C. Section 450 *et seq.),* as amended, (hereafter "ISDA") and is incorporated into and governed by the Self-Determination Contract between UNHS and the IHS dated July 10, 2002. Pursuant to the terms of this Agreement, UNHS is authorized to plan, conduct, operate, and administer the programs, functions, services and activities (PFSAs) identified in Section 3 below. All terms of this Agreement shall be governed by the ISDA and the implementing regulations. To the extent that any term in this Agreement may be construed as being inconsistent with the ISDA or exceeding the authority of the ISDA, the provisions of the ISDA shall govern.

**SECTION 2 -- EFFECTIVE DATE AND TERM.** This Agreement shall become effective July 15, 2002 and shall extend through July 14, 2003.

**SECTION 3 -- PROGRAMS, FUNCTIONS, SERVICES, AND ACTIVITIES TO BE PROVIDED BY UNHS.** UNHS will operate and administer the PFSAs identified below, except that UNHS reserves the right to rebudget funds among the programs and services currently provided under this AFA and to use rebudgeted funds and program income to add programs and services as approved by UNHS. The determination of the priority and amounts of funds to be utilized for each PFSA shall be the responsibility of UNHS except as limited by law, or otherwise contained in this Agreement.

The services are to be provided at facilities operated by the Utah Navajo Health System, Inc. Funding is provided under this Agreement for Navajo tribal members and other eligible IHS beneficiaries residing in the UNHS service area.

UNHS will be responsible for the provision and operation of all PFSAs listed in Attachment A, which may change from time to time as provided for in this section and in Section 18 below. UNHS anticipates that these services will be provided directly by UNHS. Some of these services may be provided through personal service contracts or other contracts or agreements with outside providers. The UNHS Chief Executive Officer is responsible for the day to day management and administration of UNHS according to the policies and procedures established by the UNHS Board of Directors.

**SECTION 4 -- SERVICES TO NON-BENEFICIARIES.**  Services may be provided by UNHS to otherwise ineligible persons as provided under Section 813 of the Indian Health Care Improvement Act ("IHCIA"), as amended, and other applicable law.

**SECTION 5 -- FEDERAL TORT CLAIMS ACT COVERAGE.**

(A)     The Federal Tort Claims Act applies to PFSAs under this AFA to the extent provided in Section 102(c) of the ISDA and as set forth in 25 C.F.R. Sections 900.180 through 900.210.

(B)     For purposes of Federal Tort Claims Act coverage, UNHS is deemed to be part of the Indian Health Service in the Department of Health and Human Services and its employees are deemed by statute to be employees of the Federal government when acting within the scope of their employment in carrying out the contract or this AFA. Their status is not changed by the source of the funds used to pay the employee's salary and benefits as long as the employee does not receive additional compensation for the performance of covered services from anyone other than UNHS.

(C)     Individuals providing services under personal services contracts with organizations or entities to provide health care services under this Agreement in a facility owned, operated or constructed under the jurisdiction of the Indian Health Service are covered by the Federal Tort Claims Act in accordance with Section 102(d) of the ISDA, 25 C.F.R. Section 900.193, and 25 U.S.C. 1638c.

**SECTION 6 -- AMOUNT OF FUNDS.**  The "UNHS Fiscal Year 2002 Program Funding Table," attached as Attachment B, shows the amounts by IHS budget category available to UNHS in FY 2002 dollars for the contracted PFSAs identified in Section 3. These amounts, and the amounts to be provided under this AFA, are shown in detail in Attachment B. As provided in paragraph 6(E), these amounts were calculated using FY 2002 funding amounts. Agreements concerning adjustments to these amounts are noted in Attachment B or in this AFA and funds will be transferred to UNHS under this AFA

to the extent that UNHS assumes the associated PFSAs during the period covered by this AFA. The IHS funding allocations shown in Attachment B are not binding on UNHS, and UNHS may rebudget funds between and among activities according to its priorities to the extent otherwise permitted by applicable appropriations law (see, e.g., Section 11 of this Agreement).

(A)     NAIHS Area Office Resources.  The NAIHS's Area Office resources are identified in the table entitled "Navajo Area Office Tribal Shares Table," attached as Attachment C.  The amounts available to Area tribes are shown on Attachment C.  All funds for Sanitation Facilities Construction [PL 86-121] have been retained by the Area.  The Area also will retain funds for other PFSAs which UNHS will not be assuming under Section 3 of this AFA.

The total amount of Area Office resources that support or benefit UNHS PFSAs under this Agreement is shown on Attachment C.  This amount is for UNHS only and does not include resources benefitting or supporting other tribes or PFSAs under contract by the Navajo Nation, other tribal organizations, or retained NAIHS PFSAs.

(B)     Headquarters.  UNHS's IHS Headquarters Tribal Shares and the funds available in FY 2002 are shown in Attachment D.  These amounts are for UNHS only and do not include resources shown as benefitting or supporting other tribes or programs operated by the Navajo Nation under its separate Indian Self-Determination contract(s) with IHS, or PFSAs retained by NAIHS. UNHS shall use these funds in support of the PFSAs in this AFA.

UNHS will receive a share of the balance of funds remaining in the "Emergency Fund", and "Management Initiatives" line items (as shown on the FY 2002 Headquarters tables).  Any such balance shall be distributed in accordance with the "Tribal Size Adjustment" methodology or such other methodology or program formula which is utilized to make funding available to other tribes and tribal organizations. Any such funds shall be distributed within 10 calendar days after they are adviced to NAIHS, or the end of the fiscal year, whichever is sooner.

(C)     Contract Support Cost Funds.

        The amount of UNHS  Contract Support Cost requirement is set forth in Attachment F.  The parties acknowledge that IHS will calculate and pay UNHS contract support cost funding pursuant to Section 106 of the ISDA, IHS Circular 2001-05, "Contract Support Cost Funding" or its successor, and any statutory requirements imposed by Congress.

(D)     Competitive, Formula and Other Funds.  Funds (for PFSAs assumed by UNHS under section 3 of this Agreement) not now included in this Agreement, which are available to the area office, service

units, operating units,  or tribes on a competitive, formula, or other basis, including non-recurring funding, shall be determined by the relevant calculation.  These funds shall be made available to UNHS on the same basis as such funds are available to the Area Office, service units, operating units, or other tribes and tribal organizations, and any such  funds due UNHS in FY 2002 shall be added to this Agreement. This does not include grant awards, which remain subject to the conditions or restrictions set forth in the awarding instrument.

**(E)     Adjustments and Increases.** The funding amounts referenced in this AFA and its attachments are subject to change based upon the IHS Fiscal Year 2002 and 2003 final appropriations  and the actual date of assumption of PFSAs by UNHS .  Within twenty (20) calendar days of the apportionment of any FY 2002 IHS Appropriations or ten (10) calendar days after the effective date of this Agreement whichever is later, the amounts in this Agreement will be adjusted, and any increases promptly paid to UNHS in an advance lump sum payment. Within twenty (20) calendar days of the apportionment of any FY 2003 IHS Appropriations, the amounts in this Agreement will be adjusted, and any increases promptly paid to UNHS in an advance lump sum payment.  UNHS shall be eligible for funding for new services, service increases, inflation increases, and general increases on the same basis as the Area Office, service units, operating units, or all other tribes and tribal organizations.  Amendments reflecting payment of these funds shall be provided to UNHS after any such funds are added to the AFA.  UNHS retains the right to reject the addition of the funds to the AFA and return the funds to IHS, as provided in Section 18 below.

**(F)     Proration of Resources and Reconciliation.**  The parties agree to prorate annual resources between the NAIHS and UNHS.  The proportion of annual resources apportioned to UNHS  shall be based on the number of calendar days the PFSAs are to be operated by UNHS  over 365 calendar days. The remaining proportion of resources will remain with the NAIHS.

## SECTION   7  --  PROGRAMS, FUNCTIONS, SERVICES, AND ACTIVITIES, RETAINED BY IHS.

**(A)     Residual Administrative Functions and Resources.**  IHS shall remain responsible for "inherently federal" services and functions with the resources retained by the IHS as "provisional residual," as identified in Attachment E.

**(B)     Retained Functions and Resources**. IHS retains responsibility and UNHS remains eligible for all non-residual PFSAs which UNHS did not assume under Section 3 and for which UNHS did not receive funds, including the Office of Environmental Health & Engineering.  UNHS reserves the right to negotiate with IHS to include such retained activities in this or subsequent agreements.

## SECTION 8 -- PAYMENT OF FUNDS.

UNHS FY 2002 ANNUAL FUNDING AGREEMENT  (cont.)                    Page 5

---

Any and all funds due UNHS under this Agreement, as specified by Section 6 and listed in Attachments B, C, and D, that are recurring to NAIHS shall be included in an advance lump sum payment to UNHS as provided in Article II, Section 6 of the Self-Determination Contract. Specifically, the IHS shall provide all recurring funding due under this Agreement in one lump sum payment within twenty (20) calendar days of the apportionment of such funds, or within ten (10) calendar days of the effective date of the Contract, whichever is later. Competitive, formula, and other funds that require tribal consultation and further calculation shall be paid within ten (10) calendar days of the date on which the Area Director reaches a final allocation decision following tribal consultation, or within 10 calendar days of the effective date of the Contract, whichever is later. Such allocation decisions shall be made no later than twenty (20) calendar days after the date on which the funds are adviced to the Navajo Area. IHS shall pay to UNHS any interest that may be due under the Prompt Payment Act (31 U.S.C. § 3901 et seq.) for late payments under this Agreement.

**SECTION 9 -- REPORTS.** UNHS shall provide to the IHS its annual A-133 Single Agency Audit Report and any Management Letters issued by the auditors. UNHS shall provide such other reports as agreed upon by the parties from time to time.

**SECTION 10 -- RECORDS.** The records generated and maintained by UNHS shall not be treated as federal records under Chapter 5 of Title 5 of the United States Code, except that:

**(A)**    **Patient Records Disclosure.** Patient medical records may be disclosed only in accordance with the applicable provisions of 5 U.S.C. Section 552a(b) and HIPAA; and

**(B)**    **Patient Records Storage.** Pursuant to Section 105(o) of the ISDA, the medical records generated by UNHS shall, at the option of UNHS, be stored with the National Archives and Records Administration to the same extent and in the same manner as other Department of Health and Human Services patient records.

**SECTION 11 -- EARMARKED AND RESTRICTED FUNDS.** Except as authorized by Congress:

**(A)**    Funds appropriated for IHS Facilities may only be used for facilities construction, repair, maintenance and improvement, and other related functions as provided in applicable appropriation acts;

**(B)**    Funds appropriated for IHS Health Services may only be used for health care and may not be used for facility activities listed in the IHS Facilities appropriation; and

**UNHS FY 2002 ANNUAL FUNDING AGREEMENT (cont.)**        **Page 6**

**(C)**     Earmarked funds (including any funds earmarked for contract health services) may only be used for the purpose for which they were appropriated.

      **SECTION 12 -- NO REDUCTION IN PROGRAMS OR SERVICES TO OTHER TRIBES.** The IHS has reviewed and determined that nothing in this Annual Funding Agreement diminishes any resources to other tribes.

      **SECTION 13 -- MEDICARE/MEDICAID BILLING AND RECOVERIES.** For PFSAs provided under this AFA, UNHS shall exercise its right pursuant to Section 405 of the Indian Health Care Improvement Act, as amended by P.L. 106-417, to submit claims directly to and recover directly from Medicare and Medicaid and these funds will be available as provided in section 6(I) of this Agreement. All funds recovered from Medicare and Medicaid shall be used as allowed by law.

      **SECTION 14 -- THIRD PARTY RECOVERIES.** Any funds recovered by UNHS through filing, litigating, or settling a claim against a third party to pay for services previously provided to IHS-eligible beneficiaries by UNHS, or for such services previously provided by the IHS through a PFSA now operated by UNHS, shall be considered program income to be utilized by UNHS in support of the PFSAs contracted herein.

      **SECTION 15 -- PERSONAL PROPERTY.** UNHS elects to take title to any personal property that may be furnished by the Federal government for use in its performance under this agreement. NAIHS shall, in consultation with UNHS, develop a list of all property available for use by UNHS and shall provide any documentation needed to transfer title and warranties to the listed property to UNHS. UNHS shall take title to all personal property purchased with funds under UNHS's ISDA contract.

      **SECTION 16 -- PRIME VENDOR CONTRACT.** Until such time as UNHS may establish agreements directly with the Veterans Administration (VA), UNHS may enter into an agreement with NAIHS under which NAIHS will purchase pharmaceuticals through the IHS/VA Prime Vendor contract, upon the request of UNHS, as an inherently federal function. Pharmaceuticals and other supplies purchased through this contract may be used for IHS-eligible persons and non-eligible persons for whom service is authorized pursuant to Section 813 of the Indian Health Care Improvement Act and other authorizing legislation.

      **SECTION 17 – SUCCESSOR FUNDING AGREEMENTS.** As provided in Section 14 of the Contract between UNHS and IHS, negotiations for a successor annual funding agreement shall begin not later than 120 days prior to the conclusion of the preceding AFA, unless the preceding AFA is for a term of less than nine months. Except as provided in Section 105(c)(2) of the Indian Self-

Determination Act, the amount of funds required by 106(a) of the ISDA for each successor AFA shall only be reduced pursuant to Section 106(b) of that Act and subject to the appropriation of funds by Congress.

### SECTION 18  --  AMENDMENT OR MODIFICATION OF THIS AGREEMENT.

**(A)        Form of Amendments.**  Except as otherwise provided in this AFA or the Contract, or by law, any modifications to this AFA shall be in the form of a written amendment and shall require the written consent of both UNHS and the IHS.

**(B)        Amendment to Add Additional Programs.**  UNHS reserves the right to identify other PFSAs that it wishes to include in this Agreement by amendment during the term of this Agreement.  If UNHS's proposal(s) to include additional activities is approved by IHS, this Agreement will be amended to include such PFSAs.

**(C)        Amendments to Add Additional Available Funding.**  UNHS shall be eligible for any increases in funding or for funding for Maintenance and Improvement Funds, other reimbursements, and new programs established under the Indian Health Care Improvement Act or any other applicable law, as well as funds available to IHS Headquarters and the NAIHS, whether those funds are recurring or non-recurring funds, on the same basis as the area office, service units, or other tribes and tribal organizations.

**(D)        Funding Increases.**  Written consent of UNHS shall not be required for issuing amendments which result from increases in actual appropriation levels or which represent an increase in funding for PFSAs identified in this AFA.  Such increases may include:

    (1) Program/Area/HQ Mandatories;

    (2) Program/Area/HQ End-of-year Distributions; CHEF and other related CHS Services; and any
        unused reserves as provided in this Agreement;

Amendments reflecting payment of these funds shall be provided to UNHS within ten (10) working days after any such funds are added to the AFA. UNHS retains the right to reject the addition of the funds to the AFA and return the funds to IHS.

UNHS FY 2002 ANNUAL FUNDING AGREEMENT  (cont.)                    Page  8

DATED this *10* day of _July_ , 2002.

UTAH NAVAJO HEALTH SYSTEM, INC.


BY: _____

Manuel Morgan, Chairperson, Board of Directors, UNHS


UNITED STATES OF AMERICA
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
INDIAN HEALTH SERVICE


BY: _____

John Hubbard, Jr., Area Director, NAIHS


BY: _____

David Jack Tarro, Senior Contracting Officer, NAIHS

Attachment A - Programs, Functions, Services and Activities Assumed by UNHS through FY2002 Annual
         Funding Agreement
Attachment B - UNHS Fiscal Year 2002 Program Funding
Attachment C - Navajo Area Office Tribal Shares Table
Attachment D - UNHS Headquarters Shares Table
Attachment E - Residual Table
Attachment F - CSC Funding Table

## SCOPE OF WORK

### Programs Funded by IHS under the Contract and IHS Agreement

UNHS agrees to administer, provide and be responsible for the PFSAs identified below in accordance with the Contract and this AFA. The Services are provided in the communities of Montezuma Creek, Aneth, Bluff, Blanding and are to serve IHS beneficiaries residing in the communities of Aneth, Bluff, Hatch, Mexican Water (UT), Montezuma Creek, Red Mesa (UT), Teec Nos Pos (UT) and Ismay (CO), Blanding (UT) and Westwater (UT) which are checkerboard areas north of the main Navajo reservation. In Monument Valley, Diabetes Control Project Community Education and Outreach services are provided. UNHS's budget categories consolidate PFSAs, regardless of funding source, as follows:

UNHS provides comprehensive primary and preventative medical, dental and mental health services in a culturally appropriate and sensitive manner with a family oriented focus to serve the population in the UNHS service area. This includes translation and/or Navajo/English bilingual access for all patients receiving any and all services at all facilities. The descriptions below are to set forth the general categories of services provided and do not include the details of each and every type of service that will be provided by UNHS, all of which will be in support of their comprehensive ambulatory care program. Additional programs may be added from time to time as funds become available from IHS and other sources, including third party revenues, to supplement and/or expand the existing programs. Such additional programs may be added without the prior consent of IHS.

The services listed below may be provided in Montezuma Creek and elsewhere within the UNHS service area, as described above.

A.    <u>Dental Program</u>: Provides dental services, including, but not limited to all dental treatment modalities including prosthodontics and includes, but is not limited to, services to increase dental health and decrease the incidence of dental disease.

B.    <u>Optometry Program</u>: Provides optometry services, including, but not limited to, eye exams and dilated fundus exams for high risk patients. Services may also be provided in locations other than UNHS facilities.

C.    <u>Behavioral Health/Substance Abuse</u>: Provides outpatient counseling and psychiatric services to individuals, groups and families incorporating traditional Navajo concepts, values and traditions. Behavioral Health services include, but are not limited to crisis counseling, mental health evaluations, ongoing counseling services, psychological testing, consultation with providers, safe home, domestic violence counseling and child abuse

1

counseling, and substance abuse prevention and treatment activities. Services may also be provided in locations other than UNHS facilities.

D.    <u>Community Injury Prevention</u>: Provides injury prevention training programs in various service area locales. Services include, but are not limited to car seat program, swimming lessons, water safety and community CPR training.

E.    <u>Public Health Nursing</u>: Provides nursing services, including, but not limited to, women's, children's and family services, community safety, immunizations, and high risk patient follow up. Services may also be provided in locations other than UNHS facilities.

F.    <u>Emergency Medical Services</u>: Provides EMS services including, but not limited to assisting local EMS programs in the delivery of first responder care, serves as treatment facility for EMS calls and assists in EMS training programs.

G.    <u>Women's Health</u>: Provides services, including, but not limited to comprehensive obstetrical and gynecological care on a primary basis.

H.    <u>Tribal Management</u>: Provides the administration of all PFSAs of UNHS's programs.

I.    <u>Administrative Services</u>: Includes, but is not limited to, developing, interpreting, coordinating and administering the organization's policies on personnel, including staffing, recruitment and retention, job classification, pay and benefits administration, training and development, employee relations, finance, accounting, contracting, payroll, insurance, data processing, internal controls, auditing, materials management, compliance activities and human resources. Numerous specific PFSAs listed below are closely related to, or part of, administrative services.

J.    <u>Executive Direction</u>: Includes, but is not limited to, program planning, including both strategic and operational planning; financial management, personnel management and ensuring that the Executive Direction meets or exceeds the requirements of regulatory programs. Includes medical, dental and behavioral health staff office functions including but not limited to credentialing, privileging, committee support and functions related to regulatory requirements. Includes activities of the UNHS Board of Directors and advisory boards.

K.    <u>Nursing Administration</u>: Includes, but is not limited to, providing leadership, direction and guidance in coordination with the UNHS executive team and facilitating use of Continuous Quality Improvement.

2

L.   <u>Reception and Eligibility Screening</u>: Includes, but is not limited to, providing expertise and assistance in determining patient eligibility and technical resources for point of service reception process; assisting patients and their families in completing required applications for third party/alternative resources for which patients may be eligible.

M.   <u>Financial Management</u>: Includes, but is not limited to, organizing, coordinating and executing budget and financial operations and coordinating efforts with other finance personnel and finance related systems.

N.   <u>Grants and Awards Management and Planning</u>: Includes, but is not limited to, proposal research, development and preparation and grant management and monitoring functions related to any grants and contract UNHS may have.

O.   <u>Business Office</u>: Includes, but is not limited to, collecting data on reimbursable expenses incurred by patients and clients, generating bills for collection from other payors (primarily Medicare and Medicaid and private insurance), conducting utilization review, insurance verification and collection activities.

P.   <u>Public Relations</u>: Includes, but is not limited to, responding to media calls coming to UNHS administration and programs, preparing material and information for public distribution and display and providing technical assistance for graphical presentational and displays. Also coordinates activities such as staff meetings, employee and family events and other special events.

Q.   <u>Human Resources</u>: Includes, but is not limited to, administering and implementing policies and procedures related to UNHS employees.

R.   <u>Telecommunications, Information and Technology Services</u>: Includes, but is not limited to, almost all aspects of technical (computerized) and non-technical (paper) information management. Information and technology services provides support function for hardware, software, applications development, telecommunications, biomedical devices and management, non-technical health information, overall systems and operations management and senior leadership level information management and strategic planning.

S.   <u>Health Information Services ("Medical Records")</u>: Includes, but is not limited to, maintaining a medical, dental and/or behavioral health record for all patients seen in any location. Other services include, but are not limited to, record storage and retrieval, review and analysis of medical records, transcriptions, coding and managing release of medical information. Records are kept in accordance with applicable federal and state regulations.

T. <u>Property and Supply</u>:   Includes, but is not limited to, the Material Management function. Material Management (Property and Supply) ranges from management and distribution of supplies, equipment and mail, to overseeing numerous rental and maintenance contracts, to inventory control of equipment assets.

U. <u>Housekeeping</u>:  Includes, but is not limited to, the provision of (a) routine cleaning of facility surfaces in patient care and non-patient care areas, (b) unscheduled and/or emergency housekeeping services that are considered necessary for reasons of health, safety or patient care (spills, etc.); and (c) assisting the various department managers with their responsibility to monitor the facilities' interior for areas needing repair and reporting of same. Services may also be provided in locations other than UNHS facilities.

V. <u>Quality Resources</u>: Includes, but is not limited to, providing education, coordination and support in the areas of Continuous Quality Improvement, risk management, corporate compliance, medical cost recovery and issues relating to complying with certifying and regulatory agencies; providing, through Risk Management, legal research, processing subpoenas, coordinating depositions, managing tort claim cases,, investigating sentinel events and recovering medical care costs for patients involved in accidents where a third party is liable; coordinating a corporate compliance program that ensures compliance with applicable federal and state laws, rules and regulations. Services may also be provided in locations other than UNHS facilities.

W. <u>Safety and Environmental Services</u>: Includes, but is not limited to, safety management programs; hazard surveillance monitoring, hazardous materials and waste; and activities involved in accreditation surveys and OSHA inspections. Similar services may also be provided in other locations.

X. <u>Biomedical Services</u>: Includes, but is not limited to, assuring the safe use of functional equipment in diagnosis and treatment of patients through a comprehensive management program. Services may also be provided in other locations.

Y. <u>Physical Therapy</u>: A comprehensive physical therapy program is provided. Services include, but are not limited to, physical and neurological evaluation and treatment, hydrotherapy, ultrasound; occupational therapy, speech therapy, rehabilitative medicine services, self-care education and coordination with other patient service centers. Services may also be provided in other locations.

Z. <u>Pharmacy</u>:  Comprehensive pharmaceutical care is provided, including, but not limited to, recommending therapies, dispensing medications and monitoring of medication treatment plans to assure appropriate, safe, cost

effective therapies and to provide patients with information regarding their treatment to assure compliance and mitigate potential side effects.

AA.    Radiology: Comprehensive radiological services are provided, including, but not limited to, a wide range of diagnostic, interpretive and consultative services including general radiology, ultrasound, mammography and bone densitometry.

BB.    Laboratory: A full range of laboratory services are provided, including, but not limited to, specimen collection, specimen handling, diagnostic testing and clinical interpretation.

CC.    Podiatry: Includes, but is not limited to, providing comprehensive podiatric care to pediatric, adult and geriatric patients on a scheduled basis.

DD.    Diabetes Program: This program includes primary, secondary and tertiary prevention components that include, but are not limited to presenting educational and training programs targeting Native beneficiaries, holding diabetes screening clinics in the communities, developing tracking systems and methods of notifying high risk and diabetic patients to visit the clinic regularly for follow-up, conducting foot and eye clinics for diabetic patients, conducting community outreach and education activities including, but not limited to aerobics classes, organizing and conducting fun runs, and diabetes curriculum development; and gathering and reporting data related to diabetes.

EE.    Health Promotion and Disease Prevention (HPDP): In coordination with UNHS staff, this function includes, but is not limited to, the development and implementation of patient education support services and providing educational and community outreach programs.

FF.    Audiology: Includes, but is not limited to, providing audiological care to pediatric, adult and geriatric patients on a scheduled basis. Hearing aids are available on a limited basis.

GG.    Facilities Management: Includes, but is not limited to, performance and management of contracting activities and facility construction, procurement, maintenance and renovation activities.

HH.    Telehealth: UNHS participates in the Utah Telehealth Network (UTN) which supports telemedicine services, including, but not limited to radiology, speech therapy and continuing medical education.

II.    Community Recreation: This function includes, but is not limited to, community recreation activities promoting health promotion and disease prevention activities including water aerobics, swimming lessons, water

5

safety, open swimming, organized water volleyball, basketball, softball and little league. Services may also be provided in other locations.

JJ.   <u>Contract Health Services</u>: Through the CHS program, UNHS shall provide CHS services including, but not limited to, emergency services, diagnostics, emergency transportation (*e.g.,* ambulance services and life flight), specialty care, rehabilitation, and referral services to non-IHS facilities for CHS-eligible self-referred emergency patients who have provided notice as required in the federal regulations, and all CHS-eligible patients referred by UNHS (including those residing in other NAIHS program areas/Service Units). Any referrals of CHS-eligible patients to non-IHS facilities by a NAIHS Service Unit shall be paid for by IHS. IHS shall also pay the costs of Renal Dialysis and any services related to Renal Dialysis, having retained all of the available funding to do so for patients from the UNHS service area. UNHS has also received funding for and shall pay the first $21,700 in FY 2002 (threshold adjusted annually by IHS Headquarters) of costs for CHEF cases from its service area.

KK.   <u>Other Programs</u>: UNHS may, from time to time, provide and/or add additional programs not listed above in support of their comprehensive ambulatory care services for their service population.

**Attachment B**
FINAL REVISION 06/24/2002 eb

### SUMMARY OF NAVAJO AREA ALLOCATION
### RECURRING AND NON-RECURRING FUNDING
### FISCAL YEAR 2002 - UTAH NAVAJO HEALTH SYSTEM

| Activity | Recurring | Non-Recurring | Total |
|---|---|---|---|
| CONTRACT HEALTH SERVICES | | | |
| CHS Medical Contract (Annualized) | 1,400,012.00 | 0.00 | 1,400,012.00 |
| Minus CHS $ to NAIHS | (1,200,000.00) | | (1,200,000.00) |
| Total CHS $ for 106 (a) 1 Title I Contract | 200,012.00 | | 200,012.00 |
| | | | |
| HOSPITALS & CLINICS | | | |
| H & C New $ for 106 (a) 1 Title I Contract | 1,200,000.00 | 0.00 | 1,200,000.00 |
| | | | |
| | | | |
| TOTAL 106 (a) 1  $ available for Title I Contract | 1,400,012.00 | 0.00 | 1,400,012.00 |

**FY 2002**
**Navajo Area Office Shares**

| UTAH NAVAJO HEALTH SYSTEM | TSA PF | Recurring Area Office Base | Less Residual | Revised Base | % of 1998 Total Users 253,822 | 100% Share Amounts | Eligible Share % | UNHS Revised Share Amount | Liquidated % | 77 days of FY 2002 Yr 1 Due | 288 days of FY 2003 Yr 2 Due | Yr 3 Due | Leave | Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hospitals & Clinics** | | | | | | | | | | | | | | |
| 101 Office of the Area Director | | 59,955 | 0 | 59,955 | 1.979% | 1,127 | 100% | 1,127 | | 238 | 889 | | | |
| 171 Attorney | | 214,018 | 0 | 228,135 | 0.000% | 4,515 | 25% | 1,129 | | 60 | 223 | - Declination Issue - | | |
| 181 Tribal Affairs - PL 638 (25% of 1,129) | | 338,857 | (162,874) | 226,135 | 0.000% | | | | | | 2578 | - Declination Issue - | | |
| 182 Tribal Health Services | | 165,083 | (110,522) | | 1.979% | 3,267 | 100% | 3,267 | | 688 | | | | |
| 123 Contract Health Services | | 1,232,976 | 0 | | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 102 Financial Management | | 434,013 | (371,996) | 0 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 105 Admin Services | | 336,209 | 0 | | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 104 MIS | | 201,222 | 0 | | 1.979% | 7,924 | 25% | 1,981 | | 104 | 391 | - Declination Issue - | | |
| 107 Contracts & Grants (25% of 1,981) | | 400,402 | (134,987) | | 1.979% | | | | | | | - Declination Issue - | | |
| 129 Property Management | | 685,161 | (284,759) | 400,402 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 117 Personnel Management | | 1,094,891 | (99,599) | 994,985 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 147 Medical Records | | 2,000 | 0 | 2,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| 118 EMS (Navajo Nation) | | 13,000 | 0 | 13,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| 116 Nursing Admin | | 215,487 | 0 | 215,487 | 1.979% | 4,264 | 100% | 4,264 | | 900 | 3,364 | | | |
| 109 Professional Stds & Recruit. | | 203,044 | 0 | 203,044 | 1.979% | 4,018 | 100% | 4,018 | | 848 | 3,170 | | | |
| sub-total | | 5,646,106 | (1,185,634) | 4,391,078 | | 38,373 | | 20,944 | | 5,236 | 14,685 | | | |
| 114 BIA/CSA | | 47,599 | 0 | 47,599 | 0.000% | 0 | 100% | 0 | | 0 | 0 | - Declination Issue - | | |
| 189 Health Board | | 46,423 | 0 | 46,423 | 0.000% | 0 | 100% | 0 | | 0 | 0 | - Declination Issue - | | |
| 114 Assessments | | | 0 | | 0.000% | 0 | 100% | 0 | | 0 | 0 | - Declination Issue - | | |
| 134 Model Diabetes Prog HP/DP (SRI) | | 280,613 | 0 | 280,613 | 1.979% | 5,159 | 100% | 5,159 | | 1,089 | 4,070 | - Declination Issue - | | |
| | | 200,000 | 0 | 200,000 | | | | | | | | | | |
| sub-total | | | | | | | | | | | | | | |
| **Dental Health** | | | | | | | | | | | | | | |
| 288 Dental Program minus Fluoride | | 482,218 | (64,000) | 482,218 | | | | | | | | | | |
| Less JeoMo | | (64,000) | | | | | | | | | | | | |
| sub-total | | 418,218 | 0 | 418,218 | 1.979% | 8,277 | 100% | 8,277 | | 2,069 | | | | |
| **Mental Health** | | | | | | | | | | | | | | |
| 261 Mental Health Program. | | 0 | 0 | 0 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| sub-total | | 0 | 0 | 0 | | | | | | | | | | |
| **Alcohol & Substance Abuse** | | | | | | | | | | | | | | |
| 238 ASAP minus None for the Road | | 215,944 | 0 | 215,944 | 0.000% | 0 | 100% | 0 | | 0 | 0 | | | |
| sub-total | | 215,944 | 0 | 215,944 | | | | | | | | | | |
| **Public Health Nursing** | | | | | | | | | | | | | | |
| 284 Public Health Nursing | | 0 | 0 | 0 | | | | | | | | | | |
| sub-total | | 0 | 0 | 0 | | | | | | | | | | |
| **Direct Operations** | | | | | | | | | | | | | | |
| 101 Office of the Area Director | | 754,646 | (953,602) | 150,944 | 1.979% | 3,183 | 100% | 3,183 | | 671 | 2,512 | | | |
| 111 Office of the Area Director-Travel | | 25,000 | 0 | 25,000 | 1.979% | 495 | 100% | 495 | | 104 | 391 | | | |
| 148 EEO | | 86,940 | 0 | 86,940 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 106 Third Party Resources (25% of 543) | | 109,694 | 0 | 109,694 | 1.979% | 2,171 | 25% | 543 | | 470 | 1,757 | - Declination Issue - | | |
| 123 Contract Health Services | | 112,554 | 0 | 112,554 | 1.979% | 2,227 | 100% | 2,227 | | 28 | 107 | - Declination Issue - | | |
| 102 Financial Management | | 192,010 | (163,941) | 28,069 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 105 Admin Services | | 295,731 | 0 | 295,731 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 104 MIS | | 225,140 | (130,988) | 94,152 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 129 Property Management | | 192,678 | 0 | 192,678 | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 107 Contracts & Grants (25% of 264) | | 53,373 | (133,744) | | 1.979% | 1,056 | 25% | 264 | | 14 | 52 | - Declination Issue - | | |
| 103 Personnel Management | | 285,429 | 0 | | 0.000% | 0 | | 0 | | 0 | 0 | - Declination Issue - | | |
| 109 Program Planning & Evaluation | | 504,969 | 0 | 504,969 | 1.979% | 9,993 | 100% | 9,993 | | 2,108 | 7,885 | | | |
| 109 Professional Stds & Recruit. | | 64,727 | 0 | 64,727 | 1.979% | 1,281 | 100% | 1,281 | | 270 | 1,011 | | | |
| sub-total | | 2,881,381 | (1,022,475) | 1,858,906 | | 20,466 | | 17,986 | | 3,667 | 10,705 | | | |

Attachment "C"

prepared by: dmt
revised 7/20/02 by:
Rbauer
NAIHS DPA/Rcdgpls
7/20/2002 11:39 AM

**FY 2002**
**Navajo Area Office Shares**

| UTAH NAVAJO HEALTH SYSTEM | TSA PF | Recurring Area Office Base | Less Residual | Revised Base | % of 1998 Total Users 293,022 | 100% Share Amounts | Eligible Share % | UNHS Revised Share Amount | Liquidated % | 77 days of FY 2002 Yr 1 Due | 288 days of FY 2003 Yr 2 Due | Yr 3 Due | Leave | Pay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Facilities Support** | | | | | | | | | | | | | | |
| Facility Support | | | | | | | | | | | | | | |
| 115  1. Bucketed | | 516,000 | 0 | 516,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| 104  2. Real Property | | 144,450 | 0 | 144,450 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| 114  3. Facility Management | | 725,035 | (409,115) | 315,520 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| sub-total: | | 1,385,485 | (409,115) | 976,370 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| **Environmental Health Support** | | | | | | | | | | | | | | |
| 232  Environmental Health Services | | 2,389,977 | (136,477) | 2,253,500 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| Less DOH Contract | | (215,504) | | (215,504) | | 0 | | 0 | | 0 | 0 | | | |
| sub-total: | | 2,174,473 | (136,477) | 2,037,996 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| Occup. Health & Safety Management | | 228,000 | | 228,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| sub-total: | | 228,000 | | 228,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| SFCIS - #6-121 Projects | | 4,500,228 | (397,727) | 4,102,495 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| Less NECA contract | | (102,360) | | (102,360) | | 0 | | 0 | | 0 | 0 | | | |
| sub-total: | | 4,397,865 | (397,727) | 4,000,138 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| Injury Prevention | | 498,000 | | 498,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| sub-total: | | 498,000 | 0 | 498,000 | 0.000% | 0 | | 0 | | 0 | 0 | | | |
| Environmental Health Support | | | | | | | | | | | | | | |
| Recurring Base | | 7,617,200 | | 7,617,200 | | | | | | | | | | |
| Less Contract/A.O./S.U. | | (317,864) | | (317,864) | | | | | | | | | | |
| Total: | | 7,299,336 | (534,204) | 6,765,132 | | | | | | | | | | |
| **Hospital and Clinics** | | | | | | | | | | | | | | |
| 201  A/W Reserve | | 6,338,907 | 0 | 6,338,907 | 1.979% | 125,447 | 100% | 125,447 | | 125,447 | | | | |
| **Contract Health Care** | | | | | | | | | | | | | | |
| 528  CHS Reserve/Undistr - Rec | | 152,972 | 0 | 152,972 | 1.979% | 3,027 | 100% | 3,027 | | 3,027 | | | | |
| **Totals** | | 24,238,352 | (3,150,838) | 21,087,524 | | 187,430 | | 175,681 | | 139,446 | | 0 | 0 | 0 |

- Declination Issue -
- Declination Issue -
- Declination Issue -

prepared by: dmt
revised 7/2/02 by:
Rbauer
NAHS DFA/Budgets
7/2/2002 11:38 AM

TSA and Program Formula Lines, $ in Pool, Allicable Shares, Shares for Contracted SUs, and Transfer Schedule

HEADQUARTERS REVISED CALCULATIONS
PFSAs for FY 2002

per Jean Rose/HQ-DFM
Conversion to Excel
R.Bauer 06/24/02

| | | (1) $ in HQ Shares Pool | (2) SHIPROCK'S Allicable Shares | (3) UNI/SI % SUs User Prop. | (4) Shares for UNI/SI 12 mos-Yr2 | (5) Shares for Shiprock SU>YR1 | (6) Shares for Shiprock SU>YR2 | (7) Shares for Shiprock SU>YR3 | (8) Elig Share Percentage Per Area | (9) UNI/SI Revised Share Amt. | (10) Liquid % | (11) UNI/SI Yr-1 Due | (12) UNI/SI Yr 2 Due | (13) UNI/SI Yr 3 Due | (14) Destination Issues | (15) UNI/SI 12 mos Year 1 | (16) 3 mos-FY02 15-Jul-02 | (17) 9 mos-FY03 Oct '02-July '03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Hospitals & Clinics** | | | | | | | | | | | | | | | | | | |
| 101 Emergency Fund | | $4,000,000 | 0 | 10.84% | 0 | 0 | 0 | 0 | 100% | $0 | 0% | $0 | $0 | $0 | | $0 | | $0 |
| 105 Management Initiatives | | 2,085,000 | 3,042 | 10.84% | 330 | 3,042 | 3,042 | 3,042 | 100% | 0 | 0% | 0 | 0 | 0 | | 0 | 260 | 260 |
| 108 A.C.O.G. Contract | | 99,228 | | 10.84% | | | | | 100% | | 0% | | | | | | | |
| 109 H.P./D.P. Initiatives | | 1,708,159 | 55,151 | 10.84% | 5,978 | 55,151 | 55,151 | 55,151 | 100% | 0 | 0% | 0 | 0 | 0 | | 0 | 4,717 | 4,717 |
| 110 N.E.C.E. | | 1,100,250 | 33,093 | 10.84% | 3,879 | 11,678 | 22,907 | 33,093 | 100% | 0 | 0% | 0 | 0 | 0 | | 0 | 1,261 | 1,016 |
| 111 Nurse Initiatives | | 1,290,720 | 38,629 | 10.84% | 4,187 | 38,629 | 38,629 | 38,629 | 100% | 0 | 0% | 0 | 0 | 0 | | 0 | 272 | 3,304 |
| 112 Nursing Ceseps | | 619,920 | 18,989 | 10.84% | 2,059 | 10,254 | 14,621 | 18,989 | 54% | 0 | 18% | 0 | 0 | 0 | | 0 | 883 | 877 |
| 113 Chief Clinical Consultant | | 278,400 | 8,542 | 10.84% | 926 | 8,542 | 8,542 | 8,542 | 100% | 928 | 100% | 928 | 926 | 926 | | 928 | 235 | 731 |
| 118 Research Projects | | 1,251,894 | 38,208 | 10.84% | 4,142 | 38,208 | 38,208 | 38,208 | 100% | 0 | 100% | 0 | 0 | 0 | | 0 | 195 | |
| 119 A.A.I.P. Contract | | 26,000 | 826 | 10.84% | 90 | 826 | 828 | 826 | 100% | 0 | 100% | 0 | 0 | 0 | | 0 | 19 | 71 |
| 120 Clinical Support Center-Phoenix | | 1,628,837 | 49,618 | 10.84% | 5,379 | 12,404 | 31,011 | 49,618 | 25% | 1,345 | 25% | 1,345 | 3,362 | 5,379 | | 1,345 | 284 | 1,051 |
| 121 Indian Residency | | 78,100 | 2,393 | 10.84% | 259 | 2,393 | 2,393 | 2,393 | 25% | 259 | 25% | 259 | 259 | 259 | | 259 | 55 | 204 |
| 122 Recruitment/Retention | | 277,430 | 8,517 | 10.84% | 923 | 3,322 | 5,919 | 8,517 | 39% | 923 | 39% | 923 | 360 | 923 | | 923 | 76 | 76 |
| 124 US.I.U.H.S., etc. | | 2,094,824 | 63,343 | 10.84% | 6,886 | 63,343 | 63,343 | 63,343 | 100% | 6,886 | 100% | 6,886 | 6,886 | 6,886 | | 6,886 | 1,448 | 5,418 |
| 125 D.I.R. Support Fund | | 3,046,052 | 93,476 | 10.84% | 10,133 | 38,656 | 64,907 | 93,476 | 39% | 3,952 | 39% | 3,952 | 842 | 10,133 | | 3,952 | 834 | 3,118 |
| 128 National Indian Health Board | | 19,398,755 | 591,262 | 10.84% | 64,083 | 296,146 | 493,703 | 591,262 | 67% | 0 | 67% | 0 | 7,042 | 0 | | 0 | | 2,800 |
| 129 Albeq/HQ Administration | | 1,066,000 | 32,727 | 10.84% | 3,548 | 32,727 | 32,727 | 32,727 | 100% | 3,548 | 100% | 3,548 | 3,548 | 3,548 | | 3,548 | 748 | 2,800 |
| 130 Nutrition Training Center | | 462,125 | 14,091 | 10.84% | 1,526 | 14,091 | 14,091 | 14,091 | 0% | 0 | 0% | 0 | 0 | 0 | | 0 | | |
| 131 Diabetes Program-Abuq HQ | | 889,800 | 30,862 | 10.84% | 3,345 | 5,757 | 15,431 | 30,862 | 20% | 1,005 | 26% | 1,005 | 1,673 | -1,248 | | 1,005 | 231 | 854 |
| 132 Cancer Prevention-Abuq HQ | | 347,185 | 11,514 | 10.84% | 1,248 | 11,514 | 11,514 | 11,514 | 0% | 0 | 0% | 0 | 624 | 3,345 | | 0 | | |
| 133 Health Records | | 1,214,297 | 38,847 | 10.84% | 4,211 | 24,474 | 30,887 | 38,847 | 20% | 0 | 20% | 0 | 2,650 | -1,248 | | 0 | | |
| 135 Handicapped Children | | 694,815 | 22,050 | 10.84% | 2,390 | 11,025 | 22,050 | 22,050 | 0% | 0 | 20% | 0 | 1,195 | 4,211 | | 0 | | |
| 137 Medical DIR Support-Abuq HQ | | 137,170 | 3,318 | 10.84% | 360 | 1,659 | 3,318 | 3,318 | 0% | 0 | 0% | 0 | 2,390 | 2,390 | | 0 | | |
| | | 348,100 | 11,225 | 10.84% | 1,217 | 6,735 | 11,225 | 11,225 | 20% | 243 | 20% | 243 | 730 | 1,217 | | 243 | 51 | 192 |
| | | 7,785,045 | 239,886 | 10.84% | 26,004 | 119,943 | 239,886 | 239,886 | 0% | 0 | 0% | 0 | 0 | 0 | XXX | 0 | | |
| **Dental Health** | | | | | | | | | | | | | | | | | | |
| 201 IHS Dental Program | | $900,800 | $38,550 | 10.84% | $4,179 | $19,275 | $28,913 | $38,550 | 100% | $4,179 | 50% | $2,089 | $3,134 | $4,179 | | $2,089 | $441 | $1,648 |
| | | 900,800 | 38,550 | 10.84% | 4,179 | 19,275 | 28,913 | 38,550 | 100% | 4,179 | 50% | 2,089 | 3,194 | 4,179 | | 2,089 | 441 | 1,648 |
| **Mental Health** | | | | | | | | | | | | | | | | | | |
| 301 Technical Assistance | | $2,192,084 | $38,888 | 10.84% | $7,251 | $37,808 | $52,434 | $66,888 | 100% | $0 | 35% | $0 | $0 | $0 | | $0 | $0 | $0 |
| 302 C.M.I. Grants | | 1,431,484 | 44,473 | 10.84% | 4,821 | 15,965 | 30,019 | 44,473 | 100% | 0 | 100% | 0 | 0 | 0 | | 0 | | $3,770 |
| 303 National Conference | | 624,000 | 3,271 | 10.84% | 2,075 | 19,144 | 11,503 | 3,271 | 100% | 0 | 100% | 0 | 0 | 0 | | 0 | 1,006 | 3,770 |
| | | 106,000 | 3,271 | 10.84% | 355 | 3,271 | 3,271 | 3,271 | | 0 | 100% | 0 | 0 | 0 | | 0 | | |
| **Direct Operations** | | | | | | | | | | | | | | | | | | |
| 504 C.H.S. Reserve & Undistributed | | $5,986,925 | $44,081 | 10.84% | $4,778 | $44,081 | $44,081 | $44,081 | 100% | $4,778 | 100% | $4,778 | $4,778 | $4,778 | XXX | $4,778 | $1,008 | $3,770 |
|  t Health Care |  cal Intermediary | $5,235,400 | $44,081 | 10.84% | $4,778 | $44,081 | $44,081 | $44,081 | 100% | $4,778 | 100% | $4,778 | $4,778 | $4,778 | XXX | $4,778 | 1,008 | 3,770 |
| | | $2,244,415 | | | | | | | | | | | | | | | | |
| **Facilities & Envir. Hlth. Support** | | | | | | | | | | | | | | | | | | |
| 2401 San. Facilities Constr. Support | | $6,965,354 | $0 | 10.84% | $0 | $0 | $0 | $0 | | $0 | 15% | $0 | $0 | $0 | | $0 | $0 | $0 |
| 2402 Environ. Health Svcs. Support | | 1,813,232 | $0 | 10.84% | $0 | $0 | $0 | $0 | | $0 | 15% | 0 | 0 | 0 | | 0 | | |
| 2403 Facilities & Realty Support | | 1,720,375 | $0 | 10.84% | $0 | $0 | $0 | $0 | | $0 | 15% | 0 | 0 | 0 | | 0 | | |
| 2404 Facilities Engineering Support | | 1,736,823 | $0 | 10.84% | $0 | $0 | $0 | $0 | | $0 | 15% | 0 | 0 | 0 | | 0 | | |
| 2405 Engineering Services Support | | 398,762 | $0 | 10.84% | $0 | $0 | $0 | $0 | | $0 | 15% | 0 | 0 | 0 | | 0 | | |
| | | $1,027,662 | | | | | | | | | | | | | | | | |
| **1301 Direct Operations-Rockville** | | $15,481,022 | $474,049 | 10.84% | $220,487 | $71,107 | $272,579 | $474,046 | 25% | $12,847 | 15% | $1,927 | $7,387 | $12,847 | | $1,927 | $407 | $1,520 |
| | | $15,491,022 | $474,049 | 10.84% | $220,487 | $71,107 | $272,578 | $474,046 | | $12,847 | | 1,927 | 7,387 | 12,847 | | 1,927 | 407 | 1,520 |
| **GRAND TOTAL PER HDQFM** | | $84,550,342 | $2,034,010 | 10.84% | $230,467 | $912,190 | $1,473,100 | $2,034,010 | | $78,571 | | $40,373 | $59,472 | $78,571 | | $40,373 | $8,518 | $31,835 |

UTAH NAVAJO HEALTH SYSTEM — TSA — PF — $ in HQ Shares Pool

UNI/SI-WINSLOW/TUBACITY- PER HQ DFM

Attachment "D"

Attachment E

NAVAJO AREA INDIAN HEALTH SERVICE
FY 2002 Title I Core Residual Plan
MAY 2002

| | Residual FTE | Grade | Projected Salaries @ 6.52% 1/ | Projected Benefits @ 27% 1/ | 31% Operation 1/ Cost | Total Cost | Budget Activity |
|---|---|---|---|---|---|---|---|
| **OFFICE OF THE DIRECTOR** | | | | | | | |
| 1. Area Director | 1 | ES 00/04 | 140,492.76 | 37,933.05 | 55,312.00 | 233,737.80 | DO |
| 2. Chief Medical Officer | 1 | CO 071 +32 | 122,261.28 | 33,010.55 | 48,134.27 | 203,406.09 | DO |
| 3. Regional Legal Services | 1 | GS 15/04 | 109,920.30 | 29,678.48 | 43,275.62 | 182,874.40 | HC |
| 4. Secretary | 1 | GS 09/08 | 47,081.16 | 12,711.91 | 18,535.85 | 78,328.93 | DO |
| 5. Administrative Assistant | 1 | GS 09/08 | 47,081.16 | 12,711.91 | 18,535.85 | 78,328.93 | DO |
| Sub-total Office of the Director | 5 | | 466,836.66 | 126,045.90 | 183,793.59 | 776,676.15 | |
| | | | | | | | |
| **DIVISION OF ADMINISTRATIVE SERVICES** | | | | | | | |
| 1. General Supply Specialist | 1 | GM 13/00 | 78,732.78 | 21,257.85 | 30,997.10 | 130,987.73 | DO |
| Sub-total Div. of Admn. Svcs. | 1 | | 78,732.78 | 21,257.85 | 30,997.10 | 130,987.73 | |
| | | | | | | | |
| **MANAGEMENT INFORMATION SYSTEM** | | | | | | | |
| 1. Information Resource Management | 1 | GS 13/00 | 81,136.92 | 21,906.97 | 31,943.61 | 134,987.49 | HC |
| Sub-total Div. of M.I.S. | 1 | | 81,136.92 | 21,906.97 | 31,943.61 | 134,987.49 | |
| | | | | | | | |
| **FINANCIAL MANAGEMENT BRANCH** | | | | | | | |
| 1. Financial Manager | 1 | GS 14/09 | 98,540.16 | 26,605.84 | 38,795.26 | 163,941.26 | DO |
| 2. Budget Officer | 1 | GS 12/05 | 62,741.22 | 16,940.13 | 24,701.22 | 104,382.57 | HC |
| 3. Accounting Officer | 1 | GS 12/05 | 62,741.22 | 16,940.13 | 24,701.22 | 104,382.57 | HC |
| 4. Auditor | 1 | GS 12/05 | 62,741.22 | 16,940.13 | 24,701.22 | 104,382.57 | HC |
| 5. Accounting Technician | 1 | GS 07/05 | 35,371.56 | 9,550.32 | 13,925.78 | 58,847.66 | HC |
| Sub-total Financial Mgmt Branch | 5 | | 322,135.38 | 86,976.55 | 126,824.70 | 535,936.63 | |
| | | | | | | | |
| **CONTRACTS & GRANTS BRANCH** | | | | | | | |
| 1. Senior Contracting Officer | 1 | GM 13/00 | 85,580.04 | 23,106.61 | 33,692.86 | 142,379.51 | HC |
| 2. Supervisory Contract Specialist | 1 | GM 13/00 | 85,580.04 | 23,106.61 | 33,692.86 | 142,379.51 | HC |
| 3. Contract/Grants Specialist | 1 | GS 12/07 | 66,431.58 | 17,936.53 | 26,154.11 | 110,522.22 | HC |
| Sub-total Contract & Grants | 3 | | 237,591.66 | 64,149.75 | 93,539.84 | 395,281.24 | |
| | | | | | | | |
| **PERSONNEL MANAGEMENT BRANCH** | | | | | | | |
| 1. Personnel Officer | 1 | GS 14/02 | 80,389.26 | 21,705.10 | 31,649.25 | 133,743.61 | DO |
| 2. Personnel Management Specialist | 1 | GS 11/00 | 60,044.34 | 16,211.97 | 23,639.46 | 99,895.77 | HC |
| Sub-total Personnel Mgmt Branch | 2 | | 140,433.60 | 37,917.07 | 55,288.71 | 233,639.38 | |
| | | | | | | | |
| **OFFICE OF ENVIRONMENTAL HEALTH & ENGINEERING** | | | | | | | 50% @ |
| Office of Environmental Health & Engineering | | | | | | | |
| 1. OEHE Director | 1 | CO 061 + 34 | 93,944.04 | 25,364.89 | 36,985.77 | 156,294.70 | OEH/FM |
| 2. Administrative Assistant | 1 | GS 12/09 | 70,120.92 | 18,932.65 | 27,606.61 | 116,660.17 | OEH/FM |
| Sub-total OEHE Director | 2 | | 164,064.96 | 44,297.54 | 64,592.37 | 272,954.87 | |
| | | | | | | | |
| Sanitation Facilities Construction | | | | | | | |
| 1. Senior Engineer | 1 | GS 14/00 | 101,133.00 | 27,305.91 | 39,816.06 | 168,254.97 | OEH |
| 2. Engineer - NEPA | 1 | GS 13/00 | 85,580.04 | 23,106.61 | 33,692.86 | 142,379.51 | OEH |
| 3. Staff Engineer | 1 | GS 11/05 | 52,348.44 | 14,134.08 | 20,609.58 | 87,092.10 | OEH |
| Sub-total San. Fac. Construction | 3 | | 239,061.48 | 64,546.60 | 94,118.50 | 397,726.58 | |
| | | | | | | | |
| Facilities Management | | | | | | | |
| 1. Senior Engineer | 1 | GM 14/00 | 101,133.00 | 27,305.91 | 39,816.06 | 168,254.97 | FM |
| 2. Staff Engineer | 1 | GS 12/05 | 62,741.22 | 16,940.13 | 24,701.22 | 104,382.57 | FM |
| Sub-total Facilities Management | 2 | | 163,874.22 | 44,246.04 | 64,517.28 | 272,637.54 | |
| | | | | | | | |
| **TOTAL TITLE I RESIDUAL PLAN** | 24 | | 1,893,867.66 | 511,344.27 | 745,615.70 | 3,150,827.63 | |

1/ Annualized FY 2002 Pay plus 2% for Awards
Residual amount will be adjusted annually to include
Pay Act and Inflation Cost.

6/24/2002

2. 2005-2007 Area budget documents showing distribution of H & C and CHS funding to each IHS and tribally-operated service unit, including CHS shortfalls, if any

FY 2005 HOSPITAL & CLINICS RECURRING BASE

FY 2005 CONTRACT HEALTH SERVICES RECURRING BASE

pd byd3
11/15/2007 1:48 PM
PM Std
Source: H02.A0A

| FY 2005 TOTAL OHS | 5,483,288 | 2,365,386 | 576,633 | 188,000 | 2,691,645 | 644,703 | 13,813,762 | 55,358,633 |

**FY 2008 HOSPITAL & CLINICS RECURRING BASE**

FEDERAL PROGRAMS

**FY 2008 CONTRACT HEALTH SERVICES RECURRING BASE**

FEDERAL PROGRAMS

pcd by dl
11/15/2007, 1:45 PM
Source: POE AOA

## FY 2007 HOSPITAL & CLINICS RECURRING BASE

### FEDERAL PROGRAMS

| HOSPITAL & CLINICS | Chinle | Piñon | Crownpoint | Ft Defiance | Gallup | Keyenta | Shiprock | Red Mesa | GRSBC | GRSBC Assessment | Area | Area Reserve | Area Assessment | Special Diabetes | Diabetes | Federal San Juan DP | TOTAL FEDERAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY 06 Recurring Base | 17,168,455 | 5,192,144 | 10,207,009 | 16,617,712 | 33,223,594 | 7,950,216 | 34,053,833 | 3,044,347 | 10,731,787 | 269,216 | 5,028,185 | 5,754,508 | 1,626,345 | 25,000 | 272,000 | 283,140 | 154,678,405 |
| NN EMS Funds | | | | | | | | | | | | | | | | | (227,250) |
| Federal/Tribal Pay Act | 264,899 | | 617,685 | 248,915 | 1,256,985 | 497,747 | 437,773 | 111,446 | 9,270 | | 155,179 | | | | 5,402 | 6,720 | 3,470,016 |
| Inflation | 87,954 | | 157,153 | 63,388 | 319,494 | 328,094 | 135,975 | 9,510 | | 26,776 | | | | 1,376 | 1,631 | 885,045 |
| Pop Growth | 69,135 | | 161,382 | 60,012 | | | 130,978 | 223,058 | | 27,471 | | | | 1,411 | 1,673 | 908,606 |
| NAO - B/IB Stores | (2,279) | | (12,000) | (32,012) | | | (1,170) | (170,000) | | | | | | | | | |
| Staff/Operation Costs | | | | | | | | | 8,495,000 | | | | | | | | 8,495,000 |
| FY 2007 TOTAL H&C | 17,587,987 | 4,984,894 | 11,137,439 | 16,862,896 | 35,127,267 | 8,703,346 | 34,741,994 | 11,389,347 | 11,010,036 | 269,216 | 5,087,621 | 5,754,508 | 1,626,345 | 25,000 | 281,093 | 293,164 | 165,116,022 |

### PL 93-638

| HOSPITAL & CLINICS | Tuba City | Winslow | Utah Navajo | New Mtn | NNHF | NN - EMS | NN HVHN Est | NN Child Abuse | Kayenta PHN | NN BHS 370 | NN IHS 437 | TOTAL TRIBAL | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY 06 Recurring Base | 20,335,629 | 6,048,209 | 860,376 | 155,580 | 379,345 | 3,339,905 | 153,152 | 21,028 | 12,617 | 23,180 | | 31,329,025 | 186,304,010 |
| NN EMS Funds | | | | | | 227,250 | | | | | | 227,250 | |
| Federal/Tribal Pay Act | 454,697 | 144,230 | 20,658 | 3,710 | 9,045 | 79,399 | 3,652 | | | | | 745,361 | 4,222,207 |
| Inflation | 117,612 | 34,098 | 5,012 | 900 | 2,165 | 19,266 | 698 | | | | | 180,859 | 1,065,914 |
| Pop Growth | 103,663 | 35,905 | 5,143 | 923 | 2,252 | 19,766 | 910 | | | | | 185,552 | 1,093,568 |
| NAO - B/IB Stores | | | | | | | | | | | | | |
| Staff/Operation Costs | | | | | | | | | | | | | 8,495,000 |
| FY 2007 TOTAL H&C | 21,038,600 | 6,263,982 | 897,191 | 161,123 | 392,837 | 3,675,589 | 158,660 | 21,028 | 12,617 | 23,180 | | 32,654,477 | 201,185,699 |

## FY 2007 CONTRACT HEALTH SERVICES RECURRING BASE

### FEDERAL PROGRAMS

| CONTRACT HEALTH SERVICES | Chinle | Crownpoint | Ft Defiance | Gallup | Keyenta | Shiprock | NN - EMS | TOTAL FEDERAL |
|---|---|---|---|---|---|---|---|---|
| FY 06 Recurring Base | 5,531,952 | 2,990,549 | 3,559,677 | 8,241,985 | 3,603,454 | 8,299,712 | 977,765 | 44,651,369 |
| Population Growth | 75,740 | 54,533 | 54,533 | 107,199 | 70,601 | 196,206 | 10,552 | 440,747 |
| Inflation | 169,097 | 122,935 | 122,335 | 240,330 | 48,512 | 207,867 | 23,870 | 1,002,126 |
| Inflation recurring Adjustment | 9,421 | 4,506 | 4,506 | 12,046 | 4,711 | 12,977 | 1,434 | 50,522 |
| FY 2007 TOTAL CHS | 5,786,560 | 3,171,974 | 3,895,988 | 8,601,160 | 3,704,976 | 8,604,577 | 1,011,897 | 45,150,766 |

### PL 93-638

| CONTRACT HEALTH SERVICES | Tuba City | Crownpoint | Winslow | Utah Navajo | New Mtn | NNHF | Keyenta | NNHF Sage Mem | Cuba | Farmington PMS | Area | FI | TOTAL TRIBAL | TOTAL FEDERAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY 06 Recurring Base | 5,705,775 | 3,689,124 | 1,038,338 | 100,000 | 2,712,976 | 13,624,078 | 222,019 | 6,372,836 | 2,059,786 | 500,000 | 2,791,760 | 420,330 | 58,275,471 | 44,651,369 |
| Population Growth | 45,444 | 26,001 | 13,609 | | 38,076 | 192,910 | | | 57,286 | 1,079 | | | 829,997 | 440,747 |
| Inflation | 101,639 | 49,212 | 35,126 | 3,793 | 222,019 | 432,728 | 3,667 | 2,421 | 60,787 | | | | 1,434,865 | 1,062,126 |
| Inflation recurring Adjustment | 7,763 | 4,165 | 1,912 | 205 | | 17,752 | | | 1,434 | | | | 66,274 | 50,522 |
| FY 2007 TOTAL CHS | 5,860,941 | 3,160,102 | 1,091,235 | 105,846 | 3,027,298 | 14,269,717 | | 6,372,836 | 2,395,053 | 103,090 | 2,791,760 | 420,330 | 66,415,287 | 45,150,766 |

3. 2005-2007  Ft. Defiance Service Unit budget documents

ppd by: dt/rb
11/15/2007 1:42 PM
Source: HQE AOA

**FORT DEFIANCE FY 2005 RECURRING BASE**

| CLINICAL SERVICES | FY 2005 |
|---|---|
| **Hospital & Clinics** | Ft. Defiance |
| FY-04 Recurring Base | 19,563,728 |
| Transfer funds to HQE for Division of Commissioned Personnel Support. [R] | (20,301) |
| Transfer previous allowance from Recurring to Non-Recurring. | 20,301 |
| **TOTAL H&C** | **19,563,728** |

| **Dental** | Ft. Defiance |
|---|---|
| FY-04 Recurring Base | 3,783,333 |
| **TOTAL DENTAL** | **3,783,333** |

| **Mental & Health** | Ft. Defiance |
|---|---|
| FY-04 Recurring Base | 4,555,296 |
| **TOTAL MENTAL HEALTH** | **4,555,296** |

| **Alcohol & Substance Abuse** | Ft. Defiance |
|---|---|
| FY-04 Recurring Base | 80,535 |
| **TOTAL ALCOHOL** | **80,535** |

| Hospital & Clinics | 19,563,728 |
|---|---|
| Dental | 3,783,333 |
| Mental Health | 4,555,296 |
| Alcohol Prog | 80,535 |
| **GRAND TOTAL: CLINICAL SERV.** | **27,982,892** |

| **Preventative Health Nursing** | Ft. Defiance |
|---|---|
| FY-04 Recurring Base | 2,220,612 |
| **TOTAL PHN** | **2,220,612** |

| **Facility Support** | Ft. Defiance |
|---|---|
| FY-04 Recurring Base | 4,021,250 |
| Mandatories - Apprvd NAMC [R] | 46,500 |
| Rescission | (41,500) |
| **TOTAL FACILITY SUPPORT** | **4,026,250** |

| **Contract Health Care** | Ft. Defiance |
|---|---|
| FY-04 Recurring Base | 3,433,491 |
| FY-05 Congressional Increase distribution per Dr. Peter memo Recurring Base. | 79,145 |
| Redistribution of Med Star | 30,076 |
| **TOTAL CHS** | **3,542,712** |

| **GRAND TOTAL FY 05 FD:** | **37,772,466** |
|---|---|

ppd by: dt/rb
11/15/2007 1:44 PM
Source: HQE AOA

## FORT DEFIANCE FY 2006 RECURRING BASE

### CLINICAL SERVICES

| Hospital & Clinics | FY 2006 Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 19,563,728 |
| Pop Growth | 127,020 |
| Inflation | 151,589 |
| 1% Recission | (195,519) |
| 1% Recission-Pop Growth | (1,270) |
| 1% IT Savings | (16,323) |
| 1% Admin Savings | (12,890) |
| Tribal Health Board Increase | 1,377 |
| **TOTAL H/C** | **19,617,712** |

| Dental | Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 3,783,333 |
| Inflation | 16,995 |
| 1% Recission | (37,833) |
| Pop Growth | 12,404 |
| Adj per mgmt | 8,434 |
| **TOTAL DENTAL** | **3,783,333** |

| Mental Health | Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 4,555,296 |
| Inflation | 11,291 |
| Pop Growth | 6,270 |
| 1% Recission | (45,553) |
| Adj per Mgmt Mtg 3/10/06 | 27,992 |
| **TOTAL MENTAL HEALTH** | **4,555,296** |

| Alchol & Substance Abuse | Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 80,536 |
| Inflation | 19,465 |
| Pop Growth | 14,777 |
| 1% Recission | (805) |
| Adj per Mgmt Mtg 3/10/06 | (23,437) |
| **TOTAL ALCOHOL** | **90,536** |

| | |
|---|---|
| Hospital & Clinics | 19,617,712 |
| Dental | 3,783,333 |
| Mental Health | 4,555,296 |
| Alcohol Prog | 90,536 |
| **GRAND TOTAL: CLINICAL SERV.** | **28,046,877** |

| Preventative Health Nursing | Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 2,220,611 |
| Federal Pay Costs | 6,079 |
| Pop Growth | 5,118 |
| 1% Recission | (22,071) |
| Adj per Mgmt Mtg 3/10/06 | 10,874 |
| **TOTAL PHN** | **2,220,611** |

| Facility Support | Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 4,026,250 |
| Mandatories | 178,471 |
| Trf funds V. Loretto | (27,800) |
| Recission | (60,148) |
| **TOTAL FACILITY SUPPORT** | **4,116,773** |

| Contract Health Care | Ft. Defiance |
|---|---|
| FY 05 Recurring Base | 3,542,712 |
| Population Growth | 146,939 |
| Trf funds fr Med Star to SU | 10,026 |
| **TOTAL CHS** | **3,699,677** |

| **GRAND TOTAL FY 06 FD:** | **38,083,938** |
|---|---|

**FORT DEFIANCE FY 2007 RECURRING BASE**

| CLINICAL SERVICES | FY 2007 |
|---|---|
| **Hosptial & Clinics** | Ft. Defiance |
| FY 06 Recurring Base | 19,617,712 |
| Federal/Tribal Pay Act | 248,915 |
| Inflation | 63,368 |
| Pop Growth | 65,012 |
| NAO - 81(B) Stores | (32,812) |
| **TOTAL H/C** | **19,962,195** |

| **Dental** | Ft. Defiance |
|---|---|
| FY 06 Recurring Base | 3,783,333 |
| **TOTAL DENTAL** | **3,783,333** |

| **Mental Health** | Ft. Defiance |
|---|---|
| FY 06 Recurring Base | 4,555,296 |
| **TOTAL MENTAL HEALTH** | **4,555,296** |

| **Alcohol & Substance Abuse** | Ft. Defiance |
|---|---|
| FY 06 Recurring Base | 90,536 |
| Federal Pay Cost | 2,184 |
| Inflation | 1,408 |
| Pop Growth | 1,408 |
| Equitable Recurring Base Adjustment | 632 |
| **TOTAL ALCOHOL** | **96,168** |

| Hospital & Clinics | 19,962,195 |
|---|---|
| Dental | 3,783,333 |
| Mental Health | 4,555,296 |
| Alcohol Prog | 96,168 |
| **GRAND TOTAL: CLINICAL SERV.** | **28,396,992** |

| **Preventative Health Nursing** | Ft. Defiance |
|---|---|
| FY 06 Recurring Base | 2,220,611 |
| **TOTAL PHN** | **2,220,611** |

| **Facility Support** | Ft. Defiance |
|---|---|
| FY 06 Recurring Base | 4,116,773 |
| Mandatories | 170,508 |
| **TOTAL FACILITY SUPPORT** | **4,287,281** |

| **Contract Heath Care** | Ft. Defiance |
|---|---|
| FY 06 Recurring Base | 3,699,677 |
| Population Growth | 54,533 |
| Inflation | 122,326 |
| Inflation recurring Adjustment | 5,462 |
| **TOTAL CHS** | **3,881,998** |

| **GRAND TOTAL FY 07 FD:** | **38,786,882** |
|---|---|

**RECEIVED**

APR 1 5 1997

Office of
United States Attorney
Anchorage, AK

**FILED**

APR 1 5 1997

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By _____ _____ Deputy

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| YUKON-KUSKOKWIM HEALTH CORPORATION, INC., ) ) ) | |
| Plaintiff, ) ) | Case No. A96-155 CV (JWS) |
| vs. ) ) | **ORDER FROM CHAMBERS** |
| DONNA E. SHALALA, Secretary of the ) United States Department of Health ) and Human Services; MICHAEL H. ) TRUJILLO, Director of Indian Health ) Services; and GERRY H. IVEY, ) Director, Alaska Area Native Health ) Services, ) ) | (Re:  Motion to Establish Proper Scope of Review – Docket 9) |
| Defendants. ) ) | |

<u>MOTION PRESENTED</u>

At Docket 9, defendants Donna E. Shalala, Secretary of the United States Department of Health and Human Services ("DHSS"); Michael H. Trujillo, Director of Indian Health Services ("IHS"); and Gerry H. Ivey, Director, Alaska Area Native Health Services ("ANHS"),[1] move for

_____

[1]There is an additional person upon whom a summons was served, Phillip R. Lee, Assistant Secretary for Health and Public Health Services. However, Mr. Lee is not named as a defendant in plaintiff's complaint. Mr. Lee did not join in the motion at docket 9, nor should he have done so in view of the fact that plaintiff's complaint does not set forth a claim against him. However, in some of plaintiff's other pleadings Mr. Lee's name appears in the caption. It does not appear that it is necessary for plaintiff to sue Mr. Lee in order to obtain relief, because his superior, Secretary Shalala, is named as a defendant. Mr. Lee is not considered to be a party, and plaintiff shall cease to include his name in the case caption.

26

an order establishing that the scope of review[2] applicable in this case is that set forth in the Administrative Procedure Act ("APA") at 5 U.S.C. § 706(2)(A). In the memorandum supporting the motion, defendants also urge the court to enter an order prohibiting discovery in this action on the grounds that it is an appeal from an administrative action which should be reviewed on the basis of the administrative record. The motion was opposed. Oral argument was heard on February 12, 1997.

### BACKGROUND

Under the Indian Self-Determination and Education Act, 25 U.S.C. § 450 et seq. ("the Act"), the Secretary of DHSS is directed[3] to contract with tribal organizations so that the tribal organizations themselves may plan, conduct, and administer various government programs. 25 U.S.C. § 450f(a)(1). In general, the contracts are ones which relate to the provision of benefits to Native Americans, and the contracts are commonly called "self-determination" contracts. Plaintiff Yukon-Kuskokwim Health Corporation, Inc.("YKHC") is a tribal organization. Since October 1991, YKHC has operated the IHS' Yukon-Kuskokwim Delta Regional Hospital and associated health care programs in Bethel, Alaska, pursuant to a self-determination contract. Prior to October 1991, the hospital and health care programs in Bethel were operated by IHS. Funding for self-determination contracts is to be provided in an amount, "not . . . less than the . . .

---

[2] Defendants' motion is titled "Motion To Establish Proper *Scope* of Review" (italics added), and the supporting memorandum is similarly titled. The precise relief sought is (1) the prohibition of all discovery, and (2) an order establishing that the *standard* of review is the arbitrary and capricious standard set out at 5 U.S.C. § 706(2)(A). At footnote 2 of defendants' reply, defendants set out their intention to use the terms in accord with the distinction explained in Franklin Sav. Ass'n v. Director, Office of Thrift Supervision, 934 F.2d 1127, 1136 (10th Cir. 1991), cert. denied, 503 U.S. 937, 112 S. Ct. 1475 (1992): "The scope of judicial review refers merely to the evidence the reviewing court will examine in reviewing an agency decision. The standard of judicial review refers to how the reviewing court will examine that evidence." Ironically, the title attached to 5 U.S.C. § 706, to which defendants look for the standard of review, is "Scope of Review." As this court sees it, the principal issue raised by defendants' motion is whether or not the Secretary's actions are subject to de novo review with de novo review being interpreted in this instance to mean that the court would not be confined to evidence in the existing administrative record. If de novo review is available, then discovery would be available, and the standard of review (in the Franklin Savings sense) would not be limited to the arbitrary and capricious standard. See J.L. v. Social Sec. Admin., 971 F.2d 260, 267-268 (9th Cir. 1992).

[3] The statute also applies to the Secretary of the United States, Department of the Interior.

2

Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract . . . ." 25 U.S.C. § 450j-1(a)(1).

YKHC's complaint alleges that defendants have not complied with the funding provisions of the Act. YKHC contends that had the hospital remained under IHS operation and administration after October 1, 1991, the Secretary would have continued to pay for various personnel costs and "contract support costs" for which defendants have failed to pay since YKHC assumed operation of the hospital and health programs. YKHC's first cause of action asserts that the defendants' failure to properly fund personnel costs under self-determination contract violates 25 U.S.C. § 450j-1(a)(1), while its seventh cause of action asserts that the failure to fund contract support costs also violates § 450j-1(a)(1); YKHC's second cause of action asserts that the failure to fund violates § 450 j-1(g), which requires funding in accordance with § 450j-1(a); its third cause of action alleges that in reducing the funds below those required, defendants have violated § 450j-1(b) governing reductions in contract funding; YKHC's fourth cause of action asserts that IHS Indian Self-Determination Memorandum 85-4 ("ISDM 85-4") and IHS Indian Self-Determination Memorandum 95-15 ("ISDM 95-15) were adopted in violation of the requirements of § 450k; its fifth cause of action asserts that defendants have failed to follow ISDM 85-4; and in the sixth cause of action, YKHC asserts that defendants' actions are arbitrary, capricious, and contrary to law in violation of 5 U.S.C. § 706. YKHC seeks declaratory and injunctive relief. Among other things, YKHC wants an injunction which orders defendants to pay the sums which YKHC asserts defendants have wrongfully failed to pay in the past. At oral argument, YKHC characterized this aspect of the relief sought as a claim for damages.

In its briefing YKHC says that the Contract Disputes Act does not apply to its claims for two reasons: First, the Act does not apply because YKHC's claims arise under the Act itself, rather than under contracts made pursuant to the Act. Second, because the Secretary has exclusive control of the information which shows how much would have been spent at the facilities operated by YKHC absent the self-determination contract, YKHC cannot identify the amount of money for which it would present a claim. Defendants do not argue that the Contract Disputes Act applies to any of the claims.

## DISCUSSION

### A. The Act's Objective; Its Judicial Review Provision

The objective of the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638 ("the Act") was explained this way in a senate report: "The act is intended to assure maximum participation by Indian tribes in the planning and administration of federal services, programs and activities for Indian Communities." S.Rep. No. 274, 100th Cong., 1st Sess. 37 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620, 2632. The Act directs the Secretary, upon the request of an Indian tribe, to turn over to that tribe the direct operation of its federal Indian Programs. 25 U.S.C. § 450f(a)(1). Once a tribe requests control of its programs, the Secretary and the tribe enter into a "self-determination contract." Id. at § 450l(a), (c). The Act requires the Secretary to provide the tribe the amount of funding that would have been appropriated for the federal government to operate the programs if they had not been relinquished to the tribe. Id. § 450j-1(a)(1).

In 1987, Congress began considering amendments to the Act after some tribes voiced concerns about the manner in which it had been implemented. The Indian Self-Determination and Education Assistance Act Amendments of 1988, Pub. L. No. 100-472, resulted from a comprehensive reexamination by Congress and Indian tribes of the Act. See 1988 U.S.C.C.A.N. at 2620-22. The Senate Select Committee on Indian Affairs held several hearings wherein tribal leaders and experts in tribal contracting made recommendations. Id. at 2633-34. At an oversight hearing on the Act, tribal spokespersons made many recommendations, including a recommendation that the Act be amended to "provide for Federal district court jurisdiction in contract disputes, and provide that the Contract Disputes Act applies to self-determination contracts." Id. at 2634. At subsequent hearings, tribal spokespersons reemphasized the need for full funding of indirect costs and protection of tribal contract funds from reallocation by Federal agencies to other programs. Id.

Part of the response to the concerns voiced was addition of section 110 to the Act, now codified at 25 U.S.C. § 450m-1. The new section confers upon the United States district courts "original jurisdiction over any civil action or claim against the . . . Secretary," 25 U.S.C. § 450m-

4



1(a).  It also makes the Contracts Disputes Act[4] applicable to self-determination contracts (but provides a different route for administrative appeals relating to such disputes).  25 U.S.C. § 450m-1(d).  Under 25 U.S.C. § 450m-1(a), the district court "may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof . . . or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter . . . ."

## B.  De Novo Review

### 1.  No Case Law In Point

Frequently when a district court is asked to construe a statute, it finds case law in point, if not in the circuit where it sits, at least in one of the sister circuits.  Although § 450m-1(a) was enacted almost a decade ago, there is almost no case law interpreting § 450m-1(a) and no case that is clearly in point.  The only case which deals with § 450m-1(a) is Ramah v. Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338 (D.C. Cir. 1996).  There, the district court held the Interior Secretary's allocation of contract support costs among competing tribal applicants to be the kind of action so completely committed to agency discretion that it was not subject to judicial review in spite of § 450m-1(a).  The appellate court reversed, but did not specifically address what review would be available under § 450m-1(a).  In its opinion, the Ramah court cited several cases applying the APA to support its determination that the Secretary's actions were reviewable.  Id. at 1344.  However, the court never explicitly stated that the APA provides the standard of review for claims under the Act.  Defendants argue that both the majority and dissent in Ramah make several direct references to the APA, so the holding that the Secretary "exceeded his authority under the statute" is the result of an APA-guided analysis.  See id. at 1343-44; 1350; 1352-53. However, the Ramah court also said that on remand, the district court, in its discretion, might choose to hold a hearing, at which the parties could address the distribution of $410,000 set aside pursuant to an "emergency stay" previously issued by the court of appeals itself.  Id. at 1341, n.2. That the Ramah majority indicated there might be a hearing in district court on how to disburse a fund created by judicial action is not a clear indication that de novo review applies to any claim

---

[4]Most of the Contract Disputes Act is classified to 41 U.S.C. § 601 et seq.

raised under § 450m-1(a), in this court's view. However, the dissent in <u>Ramah</u> read much into the suggestion that a hearing might be held on remand, saying that instead of obliging the district court to remand the case to the Secretary for him "to take another crack at the problem" (the usual remedy in cases that are not subject to <u>de novo</u> review), the majority made an "unprecedented suggestion" that the district court hold a hearing. <u>Id.</u> at 1352. "That approach turns principles of administrative law on their head . . . because it postures the district court as the primary decision maker rather than as a reviewing court with only limited writ under the APA." <u>Id.</u> Certainly, it might be concluded that the dissenting judge read the majority opinion to permit <u>de novo</u> review, but this court is unable to read <u>Ramah</u> so broadly.

### 2. General Orthodoxy

Defendants contend that the Act establishes no standard for the court's review of the Secretary's actions, and that the arbitrary and capricious standard of the Administrative Procedures Act ("APA") therefore controls. Defendants begin their argument with the observation that in the absence of statutory standards for judicial review, <u>de novo</u> review is generally not to be presumed. <u>United States v. Carlo Bianchi & Co.</u>, 373 U.S. 709, 715, 83 S. Ct. 1409, 1413 (1963). Defendants cite several cases which support the corollary that when a statute provides for judicial review without indicating the standard of review, a court should look to the APA for guidance.

In <u>Tribal Village of Akutan v. Hodel</u>, 869 F.2d 1185, 1193 (9th Cir.), <u>cert. denied</u>, 493 U.S. 873, 110 S. Ct. 304 (1989), it was held that review of agency action taken pursuant to the Endangered Species Act ("ESA") was subject to the arbitrary and capricious standard of review set out in the APA, because the ESA "contains no internal standard of review." In <u>Village of False Pass v. Clark</u>, 733 F.2d 605, 609 (9th Cir. 1984), the court of appeals said the same thing about review of actions taken under the ESA. <u>Friends of Endangered Species, Inc. v. Jantzen</u>, 760 F.2d 976 (9th Cir. 1985), also held that the APA's arbitrary and capricious standard of review applies to review of actions under the ESA. A more recent case relied upon by defendants is <u>Sierra Club v. Glickman</u>, 67 F.3d 90 (5th Cir. 1995). There, the appellate court held that a district court should look to the APA for the standard of review to be employed when reviewing proposed timber management plans for compliance with §§ 7 and 9 of the ESA. In another fifth



circuit case cited by defendants, <u>Avoyelles Sportsmen's League, Inc. v. Marsh</u>, 715 F.2d 897 (5th Cir. 1983), the controversy involved agency action taken pursuant to the Clean Water Act ("CWA"). The appellate court held that because the statute "does not set forth the standards for reviewing the EPA's or the Corps' decisions, we look to the [APA]." <u>Id.</u> at 715 F.2d 904.

Explaining the basis for the rule that the standard of review of agency action is presumptively that specified in the APA rather than <u>de novo</u> review, one court has written:

> This circumscription . . . stems from well ingrained characteristics of the administrative process. The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency on the administrative aspects of the litigation. Rather, the judicial function is fundamentally—and exclusively—an inquiry into the legality and reasonableness of the agency's action, matters to be determined solely on the basis upon which the action was administratively projected.

<u>Cabinet Mountains Wilderness v. Peterson</u>, 685 F.2d 678, 685 (D.C. Cir. 1982) (quoting <u>Doraiswamy v. Secretary of Labor</u>, 555 F.2d 832, 839-40 (D.C. Cir. 1976)).

### 3. The Language of § 450m-1(a)

Plaintiff attempts to avoid application of the principles discussed above by contrasting the Act's provision for judicial review which gives the district courts "original jurisdiction" over "civil actions" with the statutory provisions for judicial review in the ESA and in the CWA which do not. It is true that neither the ESA nor the CWA uses the phrase "original jurisdiction," but each does contemplate that judicial review will be by way of a "civil suit," ESA, 16 U.S.C. § 1540(g) or a "civil action," CWA, 33 U.S.C. § 1365(a). Thus, Congress' use of the term "civil action" in 25 U.S.C. §450 m-1(a), at least standing alone, does not support plaintiff's position.[5]

---

[5]Plaintiff cites <u>Chandler v. Roudebush</u>, 425 U.S. 840, 96 S. Ct. 1949 (1976) for the proposition that the term "civil action" itself is indicative that <u>de novo</u> review is required. Plaintiff has not read the decision carefully. What the Supreme Court actually said that bears on this issue was this: "The terminology employed by Congress — 'assign the case for hearing,' 'scheduled . . . for trial,' 'finds' indicates clearly that the 'civil action' to which private-sector employees are entitled under the amended version of Title VII is to be a trial <u>de novo</u>." <u>Id.</u> at 4425 U.S. 845, 96 S. Ct. 1952. Other terms, not "civil action," were indicative of trial <u>de novo</u>. The Court then went on to hold that, because federal employees were given essentially the same rights as private-sector employees, they, too, were entitled to trial <u>de novo</u>.

Plaintiff also relies on <u>Nabors v. United States</u>, 568 F.2d 657 (9th Cir. 1978). There, the Ninth Circuit held that trial <u>de novo</u> was available in actions under the Age Discrimination in Employment Act

In making the argument that by conferring "original jurisdiction" on the district courts, Congress must have meant that any review would be de novo, plaintiff relies on the definition of original jurisdiction in a popular legal dictionary which indicates that the term means "jurisdiction to consider a case in the first instance. Jurisdiction of [a] court to take cognizance of a cause at its inception, try it, and pass judgment upon the law and facts. Distinguished from *appellate* jurisdiction." Black's Law Dictionary 991 (5th ed. 1990 (italics in original)). While the definition in the legal dictionary carries no force as legal precedent, words and phrases used in statutes are generally interpreted to have their ordinary meaning, Moskal v. United states, 498 U.S. 103, 108, 111 S. Ct. 461, 465 (1990), and if the word or phrase is a technical one, then it is given the meaning generally recognized in the relevant field of specialized learning. N.L.R.B. v. Highland Park Mfg. Co., 341 U.S. 322, 326, 71 S. Ct. 758, 761 (1951). Thus, the definition of a legal phrase in a popular legal dictionary is worth considering.

It may also be noted that Article III of the United States Constitution, which creates federal judicial power, recognizes a distinction between original and appellate jurisdiction akin to that identified in Black's when it provides that the Supreme Court shall have "original jurisdiction" over certain cases and "appellate jurisdiction" in other cases. Art. III, sec. 2, cl. 2. Just as Congress may be considered to be generally familiar with the law when it enacts a statute, Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184, 108 S. Ct. 1704, 1712 (1988), it is reasonable to assume that when enacting a statute providing for the exercise of judicial power, Congress was cognizant of the plan and terminology of Article III.

To support the proposition that the term "original jurisdiction" in 25 U.S.C. § 450m-1(a) authorizes a district court to proceed de novo, plaintiff cites but a single case, Resolution Trust Corp. v. Bayside Developers, 43 F. 3d 1230 (9th Cir. 1995). There, the court addressed the question whether removal of a state court action from a state appellate court was proper and said,

---

(ADEA), relying on Chandler. This court agrees with defendants that Nabors did so because of the similarity between ADEA and Title VII. To the extent that there is dicta in Nabors supporting the proposition that the simple use of the term "civil action" denotes trial de novo, this court finds the dicta inconsistent with Chandler and impossible to reconcile with the numerous Ninth Circuit decisions holding that other statutes which employ a term such as "civil suit" or "civil action" do not provide for de novo review. E.g., Tribal Village of Akutan v. Hodel, 869 F.2d 1185 (9th Cir. 1988).



"the modern view of removal jurisdiction is more like original jurisdiction because the case after removal is treated as if it had been commenced in federal court." Id. at 1240. Bayside provides little guidance here.

Congress' use of the term "original jurisdiction" is consistent with the possibility that Congress meant to provide for a de novo review, but standing alone, "original jurisdiction" provides a slender linguistic reed upon which to base a decision that runs contrary to the orthodox principles governing judicial review of administrative agency action. Consideration of the fact that Congress employed "original jurisdiction" in combination with "civil action" in § 450m-1(a) adds support to the proposition that de novo review was contemplated, because Congress has often used that combination of terms when vesting jurisdiction in the district courts in matters that typically proceed de novo. E.g., 28 U.S.C. §§ 1331, 1332, 1335, 1337, 1338, 1339, 1340, 1343; or concurrently in the district courts and the claims court. 5 U.S.C. §§ 8715 and 8912.

Congress' use of both "original jurisdiction" and "civil action" in § 450m-1(a) provides an adequate basis in the text of the statute to support an inference that Congress did mean to provide for de novo review. On the other hand, the language used is substantially less direct than it might have been ("review shall be de novo" being one obvious alternative not used), and it would be contrary to customary norms of judicial oversight of agency action to proceed de novo. The court concludes that § 450m-1(a) is ambiguous with respect to the availability of de novo review.[6] In such a circumstance it is appropriate to consider the legislative history. Toibb v. Radloff, 501 U.S. 157, 162, 111 S. Ct. 2197, 2200 (1991).

### 4. Legislative History

The Senate Report which discusses the legislation that added the judicial review provision to the Act clearly indicates the concerns Congress addressed when it added the provision for review:

> The amendments made by [§ 450m-1] are necessary to give self-
> determination contractors viable remedies for compelling BIA and IHS

---

[6] In Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1345 (D.C. Cir. 1996), the court said that "the language of [§ 450m-1(a)] is perfectly clear and thus needs no illumination from the legislative history . . . ." However, the Ramah court's statement was made in the context of deciding the availability vel non of judicial review, not the extent of the review that would be available.

> compliance with the Self-Determination Act. The strong remedies
> provided in these amendments are required because of those agencies'
> consistent failures over the past decade to administer self-determination
> contracts in conformity with the law. Self-determination contractors'
> rights under the Act have been systematically violated particularly in the
> area of funding indirect costs. Tribal contractors are denied access to
> injunctive relief to compel agency compliance with the law where the effect
> of any court order would be to require the federal government to add funds
> to the plaintiff's contract. Furthermore, tribal contractors are unable to
> recover legal fees under the Equal Access to Justice Act even when they
> prevail on contract disputes in agency administrative proceedings.

S. Rep. No. 274, 100th Cong., reprinted in 1988 U.S.C.C.A.N. 2620, at 2656.

Defendants rather unfairly criticize plaintiff for relying on "snippits" of legislative history to support its position, when the Senate Report is suffused with expressions of concern over the failure of federal agencies to effectively promote the Act's objectives. Nevertheless, this court does not believe that a careful reading of the legislative history supports the conclusion that Congress intended de novo review of the underlying funding decisions of which plaintiff complains. First, it is apparent from the language quoted above from the senate report that Congress had a series of very specific problems in mind which it addressed in what is now codified as § 450m-1. For example, sub-section 450m-1(c) addresses the problem with respect to the Equal Access to Justice Act. Of greater consequence for present purposes, § 450m-1(a) achieves the objective of making injunctive relief available in district court whenever the Secretary violates the Act. Given the rather detailed discussion in the legislative history of just what Congress wanted to accomplish with its new provision for judicial review, Congress' failure to set out a desire for de novo review leads this court to conclude that it was not one of Congress' objectives.

### 5. Practical Considerations

Even if the language of § 450m-1(a) were adequate to support a finding that de novo review was intended in light of the legislative history, as plaintiff maintains, this court would eschew construing the ambiguous language of § 450m-1(a) to provide for such review if the provision of such review were demonstrably impractical in the overall context of the Act. Fearing that it might be, at oral argument this court invited comment on practical problems which might

10



attend de novo review.  As a result, YKHC and defendants each have filed supplemental memoranda.

An examination of the memoranda has convinced this court that de novo review of the basic funding decisions (as opposed to review of agency action for conformity with law) which YKHC attacks would entangle the court in assessing and balancing policies, programs, and principles of federal appropriations, the details of which no court is equipped to handle. The practical problems with de novo review discussed at pages 3 through 10 are too substantial to ignore when endeavoring to discern what Congress must have meant by the ambiguous language in § 450m-1.  In other words, without something more certain in the statute or more explanation in the legislative history, this court will not assume that Congress meant to turn its back on traditional principles applicable to judicial review of administrative action.

<u>CONCLUSION</u>

For the reasons set out above, the motion at docket 9 is **GRANTED** as follows: There will be neither discovery nor de novo review.  The court will apply the standards of 5 U.S.C. §706 (2) (A), (C) or (D) as appropriate.

DATED at Anchorage, Alaska, this 15 day of April 1997.

JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

A96-0155--CV (JWS)
-----------------------------------------------------
K. GOUNERS
S. LINDQUIST (US-ATTNY)

11

FILED

APR 24 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

CALIFORNIA RURAL INDIAN )
HEALTH BOARD, INC., et al., )
                           )
              Plaintiff,   )
                           )
      v.                   )      No. C-96-3526 DLJ
                           )
DONNA SHALALA, et al.,     )
                           )      ORDER
              Defendants.  )
_____  )

On April 2, 1997, the Court heard arguments on plaintiffs'
motion to compel discovery. John R. Shordike appeared on
behalf of plaintiffs and Karen K. Richardson appeared on behalf
of defendants. Having considered the arguments of counsel, the
papers submitted, the applicable law, and the record in this
case, the Court hereby DENIES plaintiffs' motion.

## I.    INTRODUCTION

A.    Factual Background and Procedural History

Plaintiffs comprise and represent more than half of the
federally-recognized Indian Tribes residing in California.
They bring this action under 25 U.S.C. § 450 et seq., the
Indian Self-Determination and Education Assistance Act ("ISDA"
or "the Act") against the administrators of the Department of
Health and Human Services ("HHS") and the Indian Health Service
("IHS") (collectively "the Agencies").

The ISDA is a unique federal statute. It allows Tribal
Organizations to request that money that IHS would have spent
providing services to the Tribes be awarded directly to the
Tribal Organizations so that they may administer the programs

themselves.  Under the Act, the Secretaries of HHS and Interior are directed to enter into "self-determination contracts" with tribal organizations to "plan, conduct, and administer programs or portions thereof."  25 U.S.C. § 450f(a)(1)(E).  "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs . . . ."  Id. at § 450j-1(a)(1).

In their complaint, plaintiffs allege various violations of ISDA.  They maintain that the Agencies have improperly withheld or deducted from ISDA contracts "sums for 'residual' agency functions," (First Claim); utilized 'forward funding' in ISDA contracts which had the effect of lowering the amount of the contracts (Second Claim); refused to distribute to ISDA contractors what defendants deem to be "program formula" funds (Third Claim); refused to contract certain "earmarked" funds (Fourth Claim); failed to timely pay contracts (Fifth and Sixth claims); and failed to provide agency funds "not otherwise obligated to particular Tribal programs" (Seventh claim).[1]  Plaintiffs seek declaratory and injunctive relief as well as mandamus ordering the Agencies to award specific contracts to the individual plaintiffs.

---

[1] In addition to these causes of action brought on behalf of all plaintiffs, a number of causes of action are brought specifically on behalf of individual Tribes or prospective contractors.

In support of their complaint, plaintiffs propounded a request for production of documents and a set of interrogatories to the named defendants. Defendants objected, not to the specific discovery requested, but to the appropriateness of any discovery in this proceeding. Defendants maintain that the ISDA provides merely for review of agency decisions under the Administrative Procedures Act, while plaintiffs maintain that they are entitled to full discovery under the Federal Rules of Civil Procedure.[2] The standard of review under ISDA appears to be a matter of first impression, and this Court agreed to hear plaintiffs' subsequent motion to compel discovery in order to resolve this question.

## II.  DISCUSSION

The question presented by this discovery motion is the standard of review to be applied by this Court. Plaintiffs maintain that this Court is directed by Congress to conduct a _de novo_ review of the Agencies' decision to deny them contracts and that therefore they are entitled to the full discovery provided by the Federal Rules of Civil Procedure. In contrast, defendants maintain that Congress intended for the Federal Courts to conduct only arbitrary and capricious review under the Administrative Procedures Act ("the APA"). Under the APA,

---

[2] Defendants also argue, however, that the discovery sought would be inappropriate even if the Federal Rules of Civil Procedure were applicable to this action. For reasons discussed below, we need not consider that question.

reviewing courts must limit their analysis of agency action to the administrative record submitted by the agency.  Resolving this difference of opinion requires the Court to interpret ISDA, the relevant statute.

A.  Statutory Language

In interpreting a statute, the goal of the courts is to "construe the language so as to give effect to the intent of Congress." United States v. American Trucking Ass'ns. Inc., 60 S.Ct. 1059, 1063 (1940).  "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." Id.  Here, §450m-1(a) states that:

> The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and . . . over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter.  In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States . . . to perform a duty provided under this subchapter or regulations promulgated hereunder . . . .

Plaintiffs make a number of arguments based upon this language in encouraging this Court to read the statute as creating a private cause of action rather than as simply conferring upon the district court the power to review the Agencies' contracting decisions.  These arguments are dealt with in order.

4

1. <u>Civil Action</u>

The first argument raised by plaintiffs is that the use of the phrase "civil action" contemplates a trial de novo. Plaintiffs cite to decisions in other contexts, notably Title VII and the ADEA in which the Supreme Court and the Ninth Circuit have read language conferring jurisdiction on the district courts over "civil actions" to require those courts to conduct de novo review of agency action. However, these decisions are not directly analogous to the present situation. For example, in <u>Chandler v. Roudebush</u>, 96 S.Ct. 1949 (1976), cited by the plaintiffs, the Supreme Court overturned a Ninth Circuit decision denying discovery on a federal employee's Title VII claim. The Court found that under Title VII, federal employees are entitled to full discovery and de novo review of Civil Service Commission discrimination decisions. However, in doing so, the Court did not merely rely on the statute's grant of jurisdiction over any "civil action" arising under the statute. Rather, the Court noted Congress's clear desire to create private rights of action for private sector employees challenging EEOC decisions, and read both the statutory language and the legislative history of Title VII as treating public and private employees identically.

<u>Nabors v. United States</u>, 568 F.2d 657 (9th Cir. 1978) an ADEA case cited by plaintiffs also fails to establish that the phrase "civil action" implies de novo review. After citing <u>Chandler</u> for the proposition that Congress generally indicates

when review is to be limited to the administrative record, the Ninth Circuit held that "the language of [the ADEA], 'A civil action . . . for such legal or equitable relief as will effectuate the purposes of this chapter,' would be to us a most unusual way of specifying review on an administrative record." Id. at 660. However, the court also relied on the similarities between the ADEA and Title VII in reaching this conclusion: "In our judgment the similarities between the two Acts in their provisions respecting federal employees are such as to completely outweigh the differences, and compel the construction that the civil action provided by both Acts be of the same character." Needless to say there is little similarity between the ISDA and either Title VII or the ADEA.

The Court concludes, therefore, that the cases interpreting the phrase "civil action" fail to establish that the use of the term indicates Congress's intent to create a private right of action.

2. Original Jurisdiction

Plaintiffs also argue that Congress's decision to confer upon the district courts "original jurisdiction" over actions arising under the ISDA indicates that Congress envisioned the courts conducting de novo proceedings. They argue that if Congress had only wished the courts to have the ability to review agency decisions under the APA, it would have couched this Court's jurisdiction in terms of "review" or "appeal" rather than original jurisdiction. In response, the government

convincingly argues that in conferring original jurisdiction on
the district courts Congress merely specified the court in
which the action could be brought in the first instance.  It is
clear that a court with original jurisdiction may exercise
essentially appellate powers (as with district court review
under the APA) while courts with appellate jurisdiction may
conduct <u>de novo</u> review (as with an appellate court's review of
a district court's conclusions of law).  Therefore, the
appropriate standard of review cannot be inferred from the
phrase "original jurisdiction."

3.  <u>Discovery Available Before Agency</u>

     A party contesting a contract denial under the ISDA may
proceed <u>either</u> to an administrative appeal or to a trial court.
25 U.S.C. § 450f(b)(3).  Congress has provided that a Tribal
Organization choosing to challenge a contracting decision via
administrative appeal shall have "the right to engage in full
discovery relevant to any issue raised in the matter."  <u>Id.</u>
This language appears to provide for the discovery under the
Federal Rules of Civil Procedure that plaintiffs seek to invoke
in this Court.  However, the statute is obviously silent
regarding whether such discovery shall also be available to
plaintiffs pursuing their challenges in district court.
Plaintiffs argue that it would been perverse for this Court to
hold that Congress intended to provide for full discovery
before the agency, but that district courts are limited to
considering the administrative record compiled by the agency.

Defendants, unsurprisingly, argue that exactly the opposite conclusion can be drawn from the availability of discovery in administrative hearings.  They argue that Congress intended to present Tribal Organizations with a choice:

> when a tribal organization receives a declination of a self-determination contract proposal, it may proceed directly to district court for review of the declination on the record that then exists, or, it may appeal administratively and take advantage of its administrative discovery and hearing rights to flesh out the administrative record.

Opposition at 19: 18-23.  That the parties suggest two equally plausible explanations of Congress's silence on the question of the discovery available in this Court indicates that the statute's provision regarding the discovery available before the agency is not dispositive of the question currently before us.

4.  <u>Money Damages</u>

Finally, plaintiffs argue that ISDA cannot provide for APA review because ISDA permits suits for money damages while the APA's waiver of sovereign immunity explicitly exempts money damage suits.  However, the APA's ban on monetary damages is far from absolute.  For example, the Supreme Court has held that the ban does not extend to actions "seeking to enforce [a] statutory mandate . . ., which happens to be one for the payment of money."  <u>Bowen v. Massachusetts</u>, 108 S.Ct. 1722, 2735 (1988).

\\\

\\\

8

1   While it is not entirely clear what money damages
2   plaintiffs are seeking in this action[3], it would appear that
3   any injuries plaintiffs have suffered have been contract
4   injuries.  Plaintiffs claim that they have been injured because
5   the agencies have failed to enter into the contracts they are
6   required by law to enter into.  The appropriate remedy for
7   these damages is to force the Agencies to execute the mandate
8   Congress has imposed upon them, in this case to enter into
9   self-determination contracts.  Therefore, plaintiffs are simply
10  seeking to enforce the Act's mandate, and this action is
11  entirely consistent with review under the APA.

12  5.  Conclusion

13      This analysis of the text of the statute reveals that the
14  statute is not clear regarding the standard of review to be
15  applied by the district courts.  We turn therefore, to the
16  legislative history of the Act in order to determine whether it
17  can shed any light on this question.

18  B.  Legislative History

19      Plaintiffs argue that even if the language of the statute
20  is found to be ambiguous, the legislative history of the Act
21  makes clear that Congress intended to provide for de novo
22  review in the district courts.

23      Plaintiffs argue that the legislative history of the Act
24  is inconsistent with the very deferential review provided for

26      [3]  Plaintiffs state only that they seek an "award of money
    damages according to proof."

9

under the ADA.  The ISDA was amended in 1988 and again in 1994.

Each time, the Agencies' discretion was limited in light of

what Congress clearly perceived to be agency intransigence.

For example, in 1988, Congress explained its grant of "original

jurisdiction" over any "civil action or claim" by an ISDA

contractor as a reaction against agency refusal to implement

the Act as written:

> The strong remedies provided in these amendments are
> required because of those agencies' consistent
> failures over the past decade to administer self-
> determination contracts in conformity with the law.
> Self-determination contractors' rights under the Act
> have been systematically violated particularly in the
> area of funding indirect costs.

Senate Report No. 100-274 (1988) at 2656.  Similar language can

be found in the legislative history of the 1994 amendments.

For example, in limiting the ability of the relevant agencies

to promulgate regulations regarding self-determination

contracts, the Senate Committee stated that the modification

have the effect of

> limiting the delegated authorization of the
> Secretaries to promulgate regulations.  This action
> is a direct result of the failure of the Secretaries
> to respond promptly and appropriately to the
> comprehensive amendments developed by this Committee
> six years ago.  The recently promulgated proposed
> regulations severely undercut Congress' intent in the
> original Act and those amendments to liberalize the
> contracting process and to put these programs firmly
> in the hands of the tribes.  The proposed regulations
> erect a myriad of new barriers and restrictions upon
> contractors rather than simplifying the contracting
> process and freeing tribes from the yoke of excessive
> federal oversight and control.  It is this
> unfortunate experience that is a major impetus for
> this bill.

Senate Report No. 103-374, 103rd Congress, 2d Sess. (1994) at

14.

This language in the legislative history is certainly clear indication that Congress was disappointed with the way in which the relevant agencies had implemented the ISDA. However, it is not evidence that Congress intended the Federal Courts to conduct de novo review of agency decisions. Congress clearly knows how to make this intention plain, and its failure to do so in this case must be read as an intention not to. See, e.g., 7 U.S.C. § 2023 (If a party feels aggrieved by a final Food Stamps determination, "it may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides . . . . The suit in the United States district court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue."); 5 U.S.C. § 7703 (A federal employee alleging discrimination may appeal Merit Systems Protection Board decisions and "shall have the right to have the facts subject to trial de novo by the reviewing court.").

It appears clear that where Congress is silent as to the standard of review to be applied, there is a strong presumption against de novo review of agency action. See, e.g., Chandler v. Roudebush, 96 S.Ct. 1949, 1960 (1976) (holding that the presumption was overcome where "both the plain language of the statute and the legislative history" point to de novo review); Consolo v. FMC, 86 S.Ct. 1018, 1026 n.17 (1966) ("[I]n the

11

absence of specific statutory authorization, a <u>de novo</u> review

is generally not to be presumed."); <u>United States v. Carlo</u>

<u>Bianchi & Co.</u>, 83 S.Ct. 1409, 1413 (1963) ("Indeed, in cases

where Congress has simply provided for review, without setting

forth the standards to be used or the procedures to be

followed, this Court has held that consideration is to be

confined to the administrative record and that no <u>de novo</u>

proceeding may be held.").

Plaintiffs also cite to <u>Chandler</u>, arguing that it stands

for the opposite proposition.  Plaintiffs quote that case for

the proposition that

> [i]n most instances, of course, where Congress
> intends review to be confined to the administrative
> record, it so indicates, either expressly or by use
> of a term like "substantial evidence" which has
> "become a term of art to describe the basis on which
> an administrative record is to be judged by a
> reviewing court."

<u>Chandler</u>, 96 S.Ct. at 1960 n. 37 (quoting <u>Carlo Bianchi & Co.</u>,

83 S.Ct. at 1414).  However, this language is entirely

consistent with this Court's reading of <u>Chandler</u>.  In that

case, the Supreme Court was merely stating that although

Congress generally specifies when it intends to limit the

review of the courts to the administrative record, when it does

not specify a standard of review, the Court will not presume

that its review is <u>de novo</u>.

Finally, plaintiffs argue that even if the Court is

unconvinced by their arguments based on the text of the statute

and its legislative history, it must nonetheless construe the

12

ISDA in the light most favorable to the Indians, as the statute was enacted for their benefit. This rule of construction was reaffirmed in <u>Bryan v. Itasca Cty. Minn.</u>, 96 S.Ct. 2102, 2112 (1976) and more recently by the Ninth Circuit in <u>Yukon Flats School Dist. v. Venetie Tribal Gov't.</u>, 101 F.3d 1286, 1294 (9th Cir. 1996) ("We begin by emphasizing the fundamental principle that statutes affecting Indian rights 'are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'") (quoting <u>Alaska Pacific Fisheries Co. v. United States</u>, 39 S.Ct. 40, 42, (1918)).

While this presumption is a strong one, the Court finds it to be inapplicable in this context. The question before the Court is one of procedure and not one of substance; the only issue decided by this order is the standard of review specified under the Act. For that reason, this case is very different from the cases cited by the plaintiffs, which considered the very substantive questions of whether Alaska Natives were entitled to set aside federal lands and whether an Indian living on a reservation was subject to state and county property taxes. As the standard of review does not affect the substantive rights of the plaintiffs one way or the other, the Court finds that the cases cited by the plaintiffs, and the presumption established therein, are inapplicable to the case currently under consideration.

\\\

\\\

13

### III.   CONCLUSION

For the reasons specified above, the Court finds that the relevant statute anticipates review under the Administrative Procedures Act rather than a trial <u>de novo</u>.  As this Court's review under the APA is limited to the record supplied by the relevant agencies, plaintiffs' motion to compel discovery is hereby DENIED.

However, if the Court determines that the administrative record is insufficient to illuminate the Agencies' decisions, the Court remains free to require additional submissions from those Agencies.

A status conference in this case will be held on May 21, 1997 at 3:30 p.m.

IT IS SO ORDERED.

Dated:     April 24, 1997

_____
D.  Lowell  Jensen
United States District Judge

For the Northern District of California